PER CURIAM.
 

 Ricardo I. Gill appeals his judgment of conviction and sentence of death for the first-degree murder of Orlando Rosello.
 
 [1]
 
 For the reasons set forth below, we affirm the conviction and sentence.
 

 
 *950
 
 OVERVIEW
 

 Ricardo I. Gill was convicted of the July-24, 2001, first-degree strangulation murder of his cellmate, Orlando Rosello, at the Department of Corrections Reception and Medical Center in Union County, Florida. The murder occurred just days after Gill was sentenced and incarcerated for the unrelated murder of Beverly Moore in Ala-chua County on July 20, 2001. In that case, Gill was sentenced to life in prison after pleading guilty to first-degree murder and requesting that the court impose the death penalty. In the present case, Gill appeared pro se after a Faretta
 
 [2]
 
 hearing, entered a guilty plea to the Rosello murder and waived a penalty phase jury and presentation of mitigation at the penalty phase. After receiving evidence as to aggravation and after reviewing mitigation evidence that appeared in the record, the trial court sentenced Gill to death. Again, Gill sought the death penalty in this case.
 

 On appeal, Gill’s appellate counsel raises three penalty phase claims. He contends (1) that because of Gill’s mental illness and brain abnormality, the trial court erred in finding that the murder was committed in a cold, calculated and premeditated manner; (2) that Gill’s death sentence is disproportionate when compared to other capital cases; and (3) that Gill’s sentence was improperly imposed in violation of the principles set forth in
 
 Ring v. Arizona,
 
 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).
 
 [3]
 
 In addition to considering the claims raised by Gill, we have a mandatory duty to examine the sufficiency of the evidence or, as in this case, the knowing, intelligent, and voluntary nature of Gill’s plea.
 
 [4]
 
 As we will explain below, we conclude that Gill’s plea was knowing, intelligent, and voluntary, and further conclude that his death sentence is proportionate and was properly imposed based on the trial court’s weighing of the aggravating and mitigating factors found by the court. We turn first to the facts and circumstances of the murder of Orlando Rosello.
 

 FACTS AND PROCEDURAL HISTORY
 

 The Circumstances of the Murder
 

 Approximately one year before Gill was sentenced to life in prison for the 1999 murder of Beverly Moore, a crime for which he entered a guilty plea, Gill wrote a letter to Judge Morris, the trial judge in that case. Gill stated:
 

 What I told the Gainesville Sun was that “I will make the judge sentence me to death. If he doesn’t, he’s gonna make me be someone I don’t want to be and make me do something I don’t want to do. If he does not act accordingly, I will kill someone, and think of your mother, your wife or your daughter.”
 

 ... [Djon’t make the next judge do the job you should have done!
 

 
 *951
 
 Gill also wrote the prosecutor a letter in the Beverly Moore case almost a year before sentencing in that case, stating:
 

 I am gonna plea guilty to all the Alachua County charges including the murder charge. It would be wise to stick to the motion you filed to seek the death penalty.
 
 I will not do the rest of my life in prison!
 
 If I am sentenced to life, I will turn into someone I am not and do things I don’t want to do. My actions will speak volumes of this last sentence. If I am sentenced to life, you and the judge will live with it on your shoulders for the rest of your life no matter what office you seek.... “What you don’t do, the next prosecutor will do with a passion.” “What the judge doesn’t do tomorrow, the next judge will do the day after tomorrow.” Think about it!
 

 As the trial court found in its sentencing order in this case:
 

 Gill told Judge Morris that if he did not receive a sentence of death [for the Moore murder], he (Gill) would make the next judge impose the death penalty. Judge Morris alerted the authorities to this threat, and Gill was transported to the Regional Medical Center at Lake Butler, Florida.
 

 Despite the warning from Judge Morris, Gill was placed in a cell with Orlando Rosello, and in the following week Gill strangled Rosello to death using a strip of cloth from a bed sheet.
 

 Gill gave a recorded confession to the Ro-sello murder in an interview with a special agent of the Florida Department of Law Enforcement (FDLE) on July 24, 2001, the day of the murder. The Inspector General of the Department of Corrections and defense attorney, Robert Rush, were present when Gill was given
 
 Miranda
 

 [5]
 

 warnings and waived his right to remain silent. Gill said he arrived at the Department of Corrections Reception and Medical Center in Union County on Friday afternoon, July 20, 2001. His first cellmate, Shorty Black, complained about being housed with Gill because he had read that Gill threatened to kill someone in order to get the death penalty. After his first cellmate complained, officers moved Gill to another cell where the Rosello murder ultimately occurred. Gill told the FDLE agent that if he had stayed with the first cellmate, he “would have slit his throat.” According to Gill, Shorty Black had a razor with him that Gill said he could have used.
 

 In spite of the fact that the Department of Corrections had been advised of Gill’s threat to kill someone, inmate Orlando Ro-sello was brought into Gill’s cell in the early morning hours on Saturday, July 21, 2001. On Sunday, July 22, Gill wrote three advance confession letters — to the prison security supervisor, to the
 
 Gaines-ville Sun
 
 newspaper and to Judge Morris — about the murder he was going to commit. In his letter to the
 
 Gainesville Sun,
 
 written immediately before the Ro-sello murder, Gill stated in part:
 

 I have stated numerous times in telephone interviews with the Gainesville Sun that I would rather die than spend the rest of my life in prison for something I didn’t do. I have made the court — former Chief Judge Robert P. Cates aware of this dating back to Jan. 28, 2000 (19 months) prior to sentencing hearing in July 20, 2001 which is in the court file of case No. 99-2277-CFA.... So after knowing this for 19 months, that I would not spend the rest of my life in prison for something I didn’t do, essentially all the appointed attorneys ... and Chief Judge Stan Morris assisted me by not upholding the oath they took to protect and defend, and repre
 
 *952
 
 sent the client as defense attorneys against said charges and each named persons could have prevented this death by taking the appropriate action in a number of ways and the most important of all was sentencing me to life without parole in which made each named persons therefore becomes an accessory before the fact and to the fact of 1st degree murder which was cold, calculated and premeditated manner without any pretense of moral or legal justification planned 19 months ago. My victim, the first inmate I came in contact with and was able to block all emotional feelings and put my mind in a state to actually take someone’s life for the first time. I Ricardo I. Gill, took the life of Orlando Rosello by strangulation.... I was not under the influence of any mental or emotional disturbance at this time and will confirm this to any court appointed expert. Had I been given the death sentence for a murder I did not commit, I would have accepted it and had it carried out quickly without any appeals or appellate reviews, but you chose to give me life which I’m adamantly against....
 

 In his interview with FDLE, Gill again said that he had decided some months earlier to commit a murder and that “I planned to kill him [Rosello] when they moved him in the room with me and I wrote those letters.”
 
 [6]
 
 Rosello and Gill interacted normally for several days; but later that week, in the early morning hours of Tuesday, July 24, Gill decided the time had come to kill Rosello. Gill explained,
 

 [W]hen I woke up this morning, I said well, I’ve already committed myself [by writing and mailing the letters], and I’ve got to follow through with it. And about 5:00 this morning, when they turned on the lights and the officer came around and poked the flaps, eat breakfast.... I took a piece of torn sheet, I wrapped it around Mr. Rosello’s neck while he was asleep, and I strangled him to death.
 

 When Gill slipped the sheet strip around the sleeping Rosello’s neck and began to strangle him, Rosello awoke and struggled briefly.
 

 After he strangled Rosello, Gill changed the position of the body and put a T-shirt over Rosello’s face because “his whole face was black, and tongue was hanging out of his mouth.” A substantial amount of blood had also come from Rosello’s ear. The murder occurred before breakfast, and when breakfast was served, Gill ate his own breakfast and dumped Rosello’s breakfast down the toilet. Gill also flushed the piece of torn bed sheet down the toilet because it had a lot of blood on it. Gill later admitted he also flushed a wadded up piece of paper he was writing on after the murder, on which he had written, “I killed at 5:00 this morning.” The paper was found in the trap of the cell toilet, along with the strip of sheet. All the physical evidence of the murder is consistent with Gill’s detailed account of the crime.
 

 Gill said he covered up the murder and told an inquiring officer that Rosello was asleep because he did not want the murder to be discovered on the midnight shift. Gill wanted to be out of the building on a false “psych emergency” when the body was discovered. However, the officer called for someone to open the cell, and when the officer tried to wake up Rosello and saw the blood, the officer asked Gill if Rosello was dead. Gill reported saying,
 
 *953
 
 “Yeah ... I strangled him.” When the interviewing officer asked Gill why he killed Rosello, Gill said:
 

 Well, for one reason, I’m not gonna spend the rest of my life in prison for something I didn’t do, which I was given a life sentence for Friday. July the 20th, and second of all, I was acting on the advice of one of my attorneys too, how he puts it, kill someone else, if I’m not satisfied with the life sentence.
 

 The attorney he referred to was not present at this interview. Gill claimed that he entered a guilty plea in the Beverly Moore murder even though he was innocent in that case because his attorney and “a bunch of other attorneys” had been “doing different things behind my back” and were not planning on going to trial to prove his innocence. Gill said he expected to receive the death penalty in the Beverly Moore murder but did not.
 

 According to the report of medical examiner William Hamilton, M.D., Orlando Rosello died as a result of ligature strangulation. He also suffered small abrasions on his forehead, a right periorbital hemato-ma, and acute pulmonary congestion and edema.
 

 Procedural History Prior to Sentencing
 

 Gill was indicted for the first-degree murder of Rosello on February 6, 2002, and was provided with appointed counsel. During the three years that this case was pending in the trial court prior to the entry of Gill’s plea, Gill sought numerous times to remove his various appointed attorneys. Gill also filed numerous motions requesting a
 
 Faretta
 
 hearing, which the trial court postponed until Gill’s competency could be determined. Over the course of these proceedings, the trial court appointed five experts to examine Gill for competency, and each provided a report concluding that Gill was competent to proceed. The court was also aware of the competency evaluations done in the Beverly Moore case, in which Gill was also found competent to proceed. The competency examinations and reports received and reviewed by the trial court spanned a five-year period.
 

 As a result of the competency examinations, which included an in-depth review of Gill’s medical records and records of his early mental health history, the court learned of Gill’s mental and behavioral problems that were manifest in his childhood. Gill was expelled from nursery school and two first-grade classes and was institutionalized at age ten for one and one-half years because of mental and behavior problems. Upon his release from that institution, he continued to have problems even though he was in counseling. Gill was then committed to the Northeast Florida State Hospital in April of 1982 and subsequently released in 1983. His record of criminal offenses began in 1986, at age seventeen, with auto theft, burglary of a conveyance, and petit theft.
 

 Although Gill was found competent to proceed in this case, the examinations disclosed the fact, not contested by the State, that Gill is mentally ill and has a long history of mental illness and behavioral difficulties. It was also discovered, after Gill was hospitalized, that he has a brain anomaly referred to as an arteriovenous malformation, which describes a brain lesion made up of an overgrowth of veins and arteries that can hemorrhage. During the proceedings below, Gill’s mental health and his affliction with the arteriovenous malformation were the subject of several hearings and rulings by the trial court.
 

 The trial court held a hearing on June 18, 2004, at which it received testimony from Dr. Clifford Levin, Ph.D., Dr. Harry Rrop, Ph.D., and Dr. Tonia Werner, M.D., who all opined that Gill was competent to proceed, although no competency order
 
 *954
 
 was entered at that time. Pursuant to one of Gill’s motions to discharge appointed counsel, a
 
 Nelson
 

 [7]
 

 hearing was held on February 18, 2005, but the court refused to discharge counsel, finding counsel was not ineffective. Gill requested a
 
 Faretta
 
 hearing at that time but the trial court refused without a further competency evaluation.
 

 On April 15, 2005, Gill announced that he was withdrawing his
 
 Faretta
 
 request. As to Gill’s competency, the trial court noted that the most recent evaluation by Dr. Elizabeth Cadiz was inconclusive on the issue of competency and proposed to order additional reports. Gill responded:
 

 THE DEFENDANT: Your Honor, you might as well make your decision today because I’m not speaking to another expert. If you can’t make your decision, this case will never end. With or without [defense counsel] Mr. Salmon’s assistance, I will implicate myself in a crime that will result in my death. So you might as well make the decision today.
 

 The trial court then ruled that Gill was competent to proceed in the case based on the prior reports of the three doctors who testified on June 18, 2004. Although Gill was still represented by counsel, he immediately asked the court to allow him to enter a guilty plea. The trial court refused to entertain the plea without a determination that Gill was waiving the assistance of counsel. After inquiry of Gill, the trial court found that Gill had not made an unequivocal request to represent himself. However, in a later hearing on May 5, 2005, in which Gill was represented by his same defense counsel, the court did rule that Gill could proceed pro se in the Rosel-lo murder case, with his current attorney acting as standby counsel.
 
 [8]
 

 Gill’s Plea and Sentencing
 

 After being found competent and being allowed to proceed pro se with standby defense counsel, Gill entered his guilty plea on July 8, 2005, and further waived a sentencing jury and presentation of any mitigation. Gill also agreed that the State could immediately present its evidence of aggravating circumstances.
 
 [9]
 
 The trial court and Gill’s standby counsel were aware of the requirements of
 
 Koon v. Dugger,
 
 619 So.2d 246, 250 (Fla.1993) (the court must confirm the defendant has discussed waiver of mitigation with counsel, who must inform the court whether there
 
 *955
 
 is mitigation that could be presented, and the court must confirm the defendant wishes to waive mitigation). However, when Gill’s standby counsel attempted to present additional mitigation, Gill objected, and the court confirmed with Gill that he wished to waive presentation of mitigation. The court was also aware of its obligations under
 
 Muhammad v. State,
 
 782 So.2d 343, 363 (Fla.2001) (emphasizing “the duty of the trial court to consider
 
 all
 
 mitigating evidence” anywhere in the record). Accordingly, the court also considered mitigation presented by the State on Gill’s behalf, as well as that appearing elsewhere in the record of the case.
 
 [10]
 
 After the State presented its closing argument, in which the prosecutor acknowledged Gill’s longstanding mental illness and brain malformation but argued that the aggravating circumstances outweighed the mental mitigation, Gill addressed the court, stating:
 

 Your Honor, this case can end with the imposition of the death penalty today. The case is then guaranteed a direct appeal, but less likely to be overturned, as the Court has found me competent in every step of the way and that every decision made by me was knowingly, freely and willingly, and furthermore you will save an innocent human life.
 

 On the flip side, if I am given life, something I do not want, there are no appeals, and I don’t want to have an opportunity to take another human’s life.
 

 I understand that death penalties are not given due to threats and the Courts do not rely on such threats, but for you to take my statements and promises, which is what they are and proven to be, with a grain of salt, like the Honorable Stan Morris, you will be second on a string of judges who has come to deliberately give me a license to take another human’s life, knowing that the judges in this circuit will never give me the death penalty.
 

 Please make the right decision and don’t be the fault of another loss of life. I may take longer than four days next time, but it will be done, and I am one hundred percent sure that it won’t be an inmate the next time.
 

 Prior to sentencing Gill, the trial court held a separate hearing in February 2006, where Dr. Alan Waldman, M.D., a forensic neuropsychiatrist, testified about Gill’s ar-teriovenous malformation, which had been discovered after it ruptured in 2004 and required Gill’s hospitalization. Dr. Wald-man, who offered his opinion that Gill was competent, explained that the arteriove-nous malformation is a “space occupying lesion” in Gill’s brain that is about two centimeters square. He said that the lesion is made up of a tangled overgrowth of veins and arteries, which in Gill’s case presses on the amygdala in the left temporal lobe of his brain.
 
 [11]
 
 This pressure can
 
 *956
 
 cause rage attacks and something called “interietal personality disorder.”
 
 [12]
 

 When asked about “interietal personality disorder,” the doctor testified, “It’s possible to have significant personality changes between temporal lobe seizures, provided that they are there, and I have no evidence that they are there.” Dr. Waldman testified that “[t]he temporal lobe seizure foci are very difficult to find. Between seizures an individual’s personality can become very different, can become hostile, unruly, they can become passive, they can have profound changes from a premorbid [before the condition] state.” According to Dr. Waldman, Gill’s arteriovenous malformation was present since birth and was evidenced by Gill’s childhood history of “discontrol syndromes” and behavioral abnormalities. He said that an arteriove-nous malformation also interrupts the ability of a person to learn from his or her experiences. When asked if the facts of the murder indicate it was the result of the rage response that can be caused by the arteriovenous malformation, Dr. Waldman said: “Not as you described it.... It certainly sounds very much like ... a thought-out, threatened, premeditated act,but I was not there that night.”
 

 A disposition hearing was held June 30, 2006, at which the trial court again advised Gill that he had a light to appointed counsel, which Gill refused. The court also asked Gill if he wished to withdraw his plea or go forward with sentencing, and Gill confirmed that he wanted to go forward. The trial court then entered its Order Imposing Sentence of Death for the murder of Orlando Rosello. In the sentencing order, the court considered four aggravating factors, but found only three to be proven: (1) Gill was under a life sentence for the murder of Beverly Moore at the time the Rosello murder was committed — section 921.141(5)(a), Florida Statutes (2002) — which was given great wreight; (2) Gill had a prior capital felony conviction for the Beverly Moore murder — section 921.141(5)(b), Florida Statutes (2002) — which was given great weight; and (3) the murder was committed in a cold, calculated and premeditated manner — section 921.141(5)(i), Florida Statutes (2002) — which was given great weight. Although the trial court based its finding of the prior violent felony aggravator only on the prior capital felony conviction involving the Beverly Moore murder, we note that evidence was presented of five other prior violent felony convictions, including attempted murder. The trial court rejected a finding that the murder was heinous, atrocious or cruel under section 921.141(5)(h), Florida Statutes (2002), primarily because Rosello was asleep when the attack occurred and when he awoke, he struggled only briefly.
 

 The trial court then considered all the mitigation that was presented, including mental mitigation in both this case and the Beverly Moore case, and found two statutory mitigators: (1) Gill was under extreme emotional or mental disturbance— section 921.141(6)(b), Florida Statutes (2002) — which was given substantial weight; and (2) Gill’s ability to ajopreciate the criminality of his act or to conform his conduct to the law was impaired — section 921.141(6)(f), Florida Statutes (2002)— which was
 
 given great
 
 weight. The trial court found Gill’s impaired ability to appreciate the criminality of his act or to
 
 *957
 
 conform his conduct to the law based in large part on the testimony of Dr. Levin, who had testified that Gill’s capacity to conform his conduct to the law was “substantially impaired” by Gill’s major depressive disorder, major mood disorder in the form of an intermittent explosive disorder and other diagnosable disorders including cocaine abuse, antisocial personality disorder and borderline personality disorder. The sentencing order noted Dr. Levin’s testimony that Gill had periodic suicide attempts, episodic failure to resist aggressive impulses, a pattern of rage, violent outbursts and inappropriate anger, poor judgment, mood swings, irritability, and some self-mutilation. The trial court also cited the fact that Gill was institutionalized at a very early age and received poor treatment, was uncontrollable, and was committed to the North Florida State Hospital, where he was frequently kept in four-point restraints to control his behavior. The trial court also found other mitigation, including that Gill’s behavior may have been affected throughout his life by the untreatable arteriovenous malformation in his brain, which can cause impulse behavior including rage, although concluding that the Rosello murder was “neither impulsive nor due to uncontrollable rage.” This mitigator was given “weight, but not great weight.”
 

 The trial court stated in sentencing Gill in this case that it relied “to a great extent on Judge Morris’s sentencing order in [the Beverly Moore murder case]” where the trial court “had access to a much greater amount of mental health information than the Court possessed in this case.” In the Alachua County Beverly Moore sentencing order, where the trial court imposed a life sentence on July 20, 2001, four days before the Rosello murder, Judge Morris found:
 

 Even as a toddler, [Gill] was clumsy, impulsive, and possessed a short attention span. He was expelled from two nursery schools and two first-grade classes before being placed in a class for emotionally handicapped students. Violent and hyperactive, he showed signs of thinking disorders, delusions, and possible hallucinations.
 

 At the young age of ten (December 1979), he was admitted to the Grant Center’s acute care unit; he remained at the center for a year and a half, during which time he displayed frequent temper tantrums (kicking, biting and scratching). He was prescribed a number of medications and placed in weekly counseling sessions to control his combative and violent behavior. He was ultimately diagnosed with childhood-type schizophrenia.
 

 Shortly after being discharged from Grant Center, Defendant again began displaying extremely aggressive, violent behaviors toward both children and adults. This behavior was so severe that he was admitted to Northeast Florida State Hospital several months later in April of 1982, where he remained for quite some time.
 

 [[Image here]]
 

 ... Just four years later, in 1987, Defendant was sentenced to seven years in prison and five years of probation for burglary of a conveyance; grand theft; armed robbery; burglary of a dwelling with an assault therein; and burglary of a dwelling with a battery therein. Upon intake, his North Florida Reception Center classification summary called his pre- and post-release prognosis “guarded” due to his history of drug use and crime.
 

 He was subsequently placed in Sumter Correctional Institution and then moved to Polk Correctional before being assigned to Union Correctional on December 1, 1987.... His readmission
 
 *958
 
 summary at North Florida Reception Center indicated he would continue to be a management problem, in part because of his numerous suicide attempts, including hanging himself, cutting his arm, and attempting to drain his blood with a syringe.
 

 [[Image here]]
 

 He was repeatedly examined, and each time the diagnoses were similar— borderline personality disorder; depression with suicidal ideations; adjustment disorder with mixed disturbance of emotional conduct; and antisocial personality disorder. At varying times, he was prescribed a number of antidepressants and other psychotropic drugs, including Elavil, Sinequan, and Serentil. While on these medications he showed sporadic improvement, but overall his condition remained the same.
 

 After reviewing the entire record, considering the mitigation presented on Gill’s behalf, and weighing the aggravators against the mitigators, the trial court found: “Despite the fact [that] RICARDO IGNACIO GILL is a deeply troubled individual with a long history of mental health problems, mental disturbances, suicidal impulses, and a life primarily spent in penal institutions ... the magnitude of Defendant’s aggravating factors outweigh[s] the magnitude of the Defendant’s statutory mitigating factors and non-statutory mitigating factors.” Accordingly, the trial court sentenced Gill to death for the murder of Orlando Rosello.
 

 On appeal, Gill’s counsel contends that due to Gill’s mental illness and his arter-iovenous malformation, the trial court erred in finding that the murder was cold, calculated and premeditated. He also contends that the death sentence is disproportionate in this case because the other aggravators were also the result of his mental illness. Finally, Gill contends that Florida’s capital sentencing procedures and his death sentence are unconstitutional under
 
 Ring v. Arizona,
 
 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). Because all the claims expressly raised by Gill relate to his sentence, and this Court’s mandatory review involves the guilt phase of the case, we turn first to the question of whether Gill’s guilty plea was knowing, intelligent, and voluntary. We will then address the penalty-phase claims that Gill presents in his appeal.
 

 ANALYSIS
 

 Knowing, Intelligent and Voluntary Nature of the Plea
 

 Gill has not challenged his conviction for first-degree murder in this appeal, nor does he challenge the acceptance of his guilty plea. However, this Court has a mandatory obligation to review the basis of Gill’s conviction for first-degree murder, even when the basis for the conviction is not challenged. In a case in which the guilt of the defendant is found by a jury, the Court reviews the sufficiency of the evidence to support the conviction.
 
 See Bevel v. State,
 
 983 So.2d 505, 516 (Fla.2008).
 
 [13]
 
 In this case, however, because Gill’s conviction resulted not from a trial but from entry of a guilty plea, “this Court’s review shifts to the knowing, intelligent, and voluntary nature of that plea.”
 
 Tanzi v. State,
 
 964 So.2d 106, 121 (Fla.2007) (quoting
 
 Winkles v. State,
 
 894 So.2d 842, 847 (Fla.2005));
 
 see also Guardado v. State,
 
 965 So.2d 108, 118 (Fla.2007);
 
 *959
 

 Lynch v. State,
 
 841 So.2d 362, 375 (Fla.2003);
 
 Ocha v. State,
 
 826 So.2d 956, 965 (Fla.2002). Under these circumstances, the “[p]roper review requires this Court to scrutinize the plea to ensure that the defendant was made aware of the consequences of his plea, was apprised of the constitutional rights he was waiving, and pled guilty voluntarily.”
 
 Ocha,
 
 826 So.2d at 965.
 

 It is axiomatic that “[a] trial court must inquire carefully into the volun-tariness of a plea” and that “[a] guilty plea ‘must be voluntarily made by one competent to know the consequences of that plea.’ ”
 
 Lopez v. State,
 
 536 So.2d 226, 228 (Fla.1988) (quoting
 
 Mikenas v. State,
 
 460 So.2d 359, 361 (Fla.1984)). Because the record established that Gill had a history of mental illness and the trial court ordered that Gill’s competency be evaluated in the case, we first discuss the issue of competence as it bears on Gill’s ability to enter a knowing, intelligent and voluntary plea. As referenced above, before accepting Gill’s guilty plea, the trial court ordered extensive mental evaluations of Gill, reviewed the experts’ reports and received testimony concerning his competence to proceed to trial. The court ultimately found that Gill was competent to proceed.
 
 [14]
 

 The United States Supreme Court in
 
 Godinez v. Moran,
 
 509 U.S. 389, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993), “reject[ed] the notion that competence to plead guilty or to waive the right to counsel must be measured by a standard that is higher than (or even different from) the
 
 Dusky
 
 standard.”
 
 Id.
 
 at 398, 113 S.Ct. 2680. The standard of competence set out in
 
 Dusky v. United States,
 
 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960), is whether the defendant has “sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding— and whether he has a rational as well as factual understanding of the proceedings against him.”
 
 Id.
 
 at 402, 80 S.Ct. 788. The Supreme Court in
 
 Godinez
 
 reasoned, “If the
 
 Dusky
 
 standard is adequate for defendants who plead not guilty, it is necessarily adequate for those who plead guilty.”
 
 Godinez,
 
 509 U.S. at 399, 113 S.Ct. 2680. The Court in
 
 Godinez
 
 explained:
 

 A defendant who stands trial is likely to be presented with choices that entail relinquishment of the same rights that are relinquished by a defendant who pleads guilty: He will ordinarily have to decide whether to waive his “privilege against compulsory self-incrimination,”
 
 Boykin v. Alabama,
 
 395 U.S. 238, 243, 89 S.Ct. 1709, 1712, 23 L.Ed.2d 274 (1969), by taking the witness stand; if the option is available, he may have to decide whether to waive his “right to trial by jury,”
 
 ibid.;
 
 and, in consultation with counsel, he may have to decide whether to waive his “right to confront [his] accusers,”
 
 ibid,.,
 
 by declining to cross-examine witnesses for the prosecution. A defendant who pleads not guilty, moreover, faces still other strategic choices: In consultation with his attorney, he may be called upon to decide, among other things, whether (and how) to put on a defense and whether to raise one or more affirmative defenses. In sum,
 
 all
 
 criminal defendants — not merely those who plead guilty — may be required to make important decisions once criminal proceedings have been initiated. And while the decision to plead guilty is undeniably a profound one, it is no more complicated than the sum total of deci
 
 *960
 
 sions that a defendant may be called upon to make during the course of a trial. (The decision to plead guilty is also made over a shorter period of time, without the distraction and burden of a trial.) This being so, we can conceive of no basis for demanding a higher level of competence for those defendants who choose to plead guilty.
 

 Godinez,
 
 509 U.S. at 398-99, 113 S.Ct. 2680.
 

 In this case, before accepting Gill’s plea, the trial court received numerous reports resulting from examinations by five different doctors, including three psychologists, a forensic psychiatrist, and a neuropsychi-atrist. The examinations were generally governed by Florida Rule of Criminal Procedure 3.211(a)(2), which provided that in considering the issue of competence to proceed, the examining experts should consider and include in their reports the following:
 

 (A) the defendant’s capacity to:
 

 (i) appreciate the charges or allegations against the defendant;
 

 (ii) appreciate the range and nature of possible penalties, if applicable, that may be imposed in the proceedings against the defendant;
 

 (iii) understand the adversary nature of the legal process;
 

 (iv) disclose to counsel facts pertinent to the proceedings at issue;
 

 (v) manifest appropriate courtroom behavior;
 

 (vi) testify relevantly; and
 

 (B) any other factors deemed relevant by the experts.
 

 Fla. R.Crim. P. 3.211(a)(2). Based on these reports, and testimony of the experts, the trial court found Gill competent to proceed.
 

 Gill’s determination of competency has not been challenged, and, based on the record of competency reviews, reports, and testimony presented in this case, we conclude that the trial court’s finding of competency is supported by competent, substantial evidence and is sufficient to establish Gill’s competence to enter a knowing, intelligent and voluntary plea. Nor has any abuse of discretion been shown in the trial court’s ruling.
 
 See Boyd v. State,
 
 910 So.2d 167, 187 (Fla.2005) (“The competency determination must be based on all relative evidence, and the decision will stand absent an abuse of discretion.”). Accordingly, our review moves to examination of the plea colloquy that occurred prior to the trial court accepting Gill’s guilty plea.
 

 When a competent defendant moves the court to accept a guilty plea, the trial court must then make a detailed inquiry into the voluntary, knowing and intelligent nature of the plea. In this case, the trial court followed the dictates of Florida Rule of Criminal Procedure 3.172 (2005). That rule requires first that the trial court determine there is a factual basis for the plea. Rule 3.172(a). This requirement was met when the trial court read the indictment to Gill and the State proffered a statement of facts supporting the indictment and the plea, which factual basis consisted of portions of Gill’s own confession to FDLE. When asked if he had any objection to the recitation of facts, Gill responded, “No, sir.”
 

 Rule 3.172(b) also requires that the plea be taken in open court, which requirement was met in this case. Under rule 3.172(c), a determination of voluntariness must be made based on a court inquiry to determine that the defendant understands (1) the nature of the charge and the mandatory minimum and maximum penalties provided by law; (2) that he or she has a right to an attorney and that one will be appointed if necessary; (3) that the defen
 
 *961
 
 dant has the right to plead not guilty and to be tried by a jury with assistance of counsel, to compel attendance of witnesses, to confront and cross-examine witnesses, and the right not to be compelled to incriminate himself or herself; (4) that a plea will give up the right to appeal all matters relating to the judgment unless expressly reserved; (5) that there will be no trial; (6) that the trial judge may examine the defendant under oath about the offense and that the answers may be later used against the defendant; (7) the terms of any plea agreement; and (8) that a plea may subject the defendant to deportation if he or she is not a United States citizen.
 
 [15]
 

 The trial court complied with the requirements of the rule, and Gill confirmed that he had discussed the plea with his standby attorneys, but maintained that he represented himself. Gill was advised of his right to have appointed counsel throughout the proceedings, to which Gill responded that he did not wish to have counsel represent him. The court read the charges contained in the indictment of February 6, 2002, to Gill and advised him of the possible sentences for first-degree murder — life in prison or death — and of the fact that the State was seeking death. Gill confirmed that he understood the maximum penalty for the murder was death. The court advised Gill that his prior murder conviction would constitute an aggravating circumstance for purposes of consideration of the death penalty, which Gill confirmed that he understood.
 

 Gill also confirmed that he understood he had a right to continue to plead not guilty to the charge, that he had a right to a jury trial that would be waived by entry of a guilty plea, and that he had a right to require the State to prove his guilt and would be waiving that right. He testified that he understood that by pleading guilty, he would be giving up his right to have counsel produce evidence on his behalf, the right to present witnesses, the right to have the jury instructed, and the right to testify or elect not to testify in his own behalf. When asked if he was taking any medication, Gill reported that he had been prescribed lithium (Eskalith) for mood swings but had not taken it the prior evening or that morning. He denied, however, that he would feel better, for purposes of the plea, if he had taken his medication. Gill denied that anything was affecting his judgment and stated his thinking was “clear.” He confirmed that no promises or threats had been made to cause him to enter a plea of guilty. Finally, Gill announced that he was entering the guilty plea “[fjreely, knowing and intelligently.”
 
 [16]
 

 Accordingly, because Gill was competent and was fully advised as required by rule 3.172 of all the rights he would be waiving and of the risk that he would be given the death penalty — and he confirmed that he understood all these rights and that his plea was freely, knowingly and intelligent
 
 *962
 
 ly given — we conclude that there was a sufficient basis for the plea and conviction, both in the factual basis supporting the plea and in the inquiry conducted by the trial court.
 

 Cold, Calculated and Premeditated Aggravator
 

 We turn now to the penalty phase issues raised by Gill’s appeal. He asserts that the trial court erred in finding that the murder of Rosello was committed in a cold, calculated and premeditated manner (CCP). This assertion is based on the contention that Gill’s mental disabilities rendered him incapable of the cool, calm reflection necessary to meet the requirements for CCP. We disagree.
 

 The presence of mental illness does not automatically make a finding of CCP inapplicable where the facts otherwise establish that the murder was committed in a cold, calculated and premeditated manner without pretense of justification. We have held that “[a] defendant can be emotionally and mentally disturbed or suffer' from a mental illness but still have the ability to experience cool and calm reflection, make a careful plan or prearranged design to commit murder, and exhibit heightened premeditation.”
 
 Lynch,
 
 841 So.2d at 371-72 (quoting
 
 Evans v. State,
 
 800 So.2d 182, 193 (Fla.2001));
 
 see also Owen v. State,
 
 862 So.2d 687, 701-02 (Fla.2003) (CCP affirmed even though Owen had organic brain damage).
 

 A determination of whether CCP is present is properly based on a consideration of the totality of the circumstances.
 
 See Hudson v. State,
 
 992 So.2d 96, 116 (Fla.2008);
 
 Lynch,
 
 841 So.2d at 372. The scope of review is limited “to ensuring that the trial court applied the correct rale of law, and if so, that there is competent, substantial evidence to support its findings” as to an aggravating factor.
 
 Caballero v. State,
 
 851 So.2d 655, 661 (Fla.2003) (citing
 
 Willacy v. State,
 
 696 So.2d 693, 695 (Fla.1997)). For CCP to be found, the killing must be “the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold); that the defendant had a careful plan or prearranged design to commit murder before the fatal incident (calculated); that the defendant exhibited heightened premeditation (premeditated); and that the defendant had no pretense of moral or legal justification.”
 
 Franklin v. State,
 
 965 So.2d 79, 98 (Fla.2007). Although Gill was angry at not receiving the death penalty in the Beverly Moore murder, that anger was expressed not in frenzy, panic or rage, but in a long-simmering plan to kill an innocent person. Dr. Wald-man, in his testimony presented before sentencing, testified that the arteriovenous malformation that was present in Gill’s brain often manifests itself in rage; but when presented with the facts of this murder, Waldman saw no direct connection between the rage that can be associated with the brain lesion and the murder of Orlando Rosello.
 

 Based on Gill’s own version of the events of July 24, 2001, the physical evidence discovered at the scene, and his letters written well in advance of the murder, it is clear that Gill had a prearranged plan, as he put it in his letter to the
 
 Gainesville Sun
 
 reporter, to “kill the first inmate I came into contact with” simply because he did not get the penalty that he sought in the Beverly Moore case. Gill admitted that he made his final decision to kill Ro-sello in the early morning hours of July 24, 2001, and fashioned a weapon from a strip of torn bed sheet to use in strangling him. The record contains no indication that Gill acted in emotional frenzy, panic, or rage. Gill admits to coldly strangling Rosello while he slept.
 

 
 *963
 
 Moreover, Gill had ample time to reflect on his intended actions and to abandon the plan to kill Rosello, but did not do so. We have found heightened premeditation necessary for CCP in similar cases where the defendant had a period of reflection affording an opportunity to abandon the plan but, instead, “acted out the plan [he] had conceived during the extended period in which [the] events occurred.”
 
 Alston v. State,
 
 723 So.2d 148, 162 (Fla.1998) (quoting
 
 Jackson v. State,
 
 704 So.2d 500, 505 (Fla.1997));
 
 see also Welch v. State,
 
 992 So.2d 206, 216 (Fla.2008) (finding CCP proven where the defendant wrote a note in advance threatening to kill the victims and had time for reflection and an opportunity to abandon the murders but did not do so).
 

 Legally sufficient evidence also exists to support CCP where, as here, the defendant procures a weapon in advance, receives absolutely no resistance or provocation on the part of the victim, and carries out the killing as a matter of course.
 
 See Franklin,
 
 965 So.2d at 98. Here, Gill fashioned a murder weapon in advance and killed Rosello, who provided no provocation and virtually no resistance. The record is also devoid of any evidence of a pretense of moral or legal justification.
 
 See id.
 
 at 99 (“Lack of resistance or provocation by the victim can indicate both a cold plan to kill as well as negate any pretense of justification.”).
 

 Competent, substantial evidence demonstrated that the murder of Orlando Rosello was clearly the result of a longstanding plan by Gill, who fashioned a murder weapon in advance and who had ample time to reflect on the proposed murder and abandon the plan, but did not — and the murder was carried out in a cold manner as a matter of course, without pretense of justification. Thus, we conclude the court properly found CCP. Moreover, no evidence was presented connecting Gill’s mental illness or his arteriovenous malformation directly to the murder. Therefore, relief is denied on this claim.
 

 Proportionality of the Death Sentence
 

 Gill’s counsel also contends that because Gill is and has been mentally ill since his childhood, the trial court erred in relying on two aggravators that were based on the Beverly Moore murder conviction and sentence, which he claims were attributable to his lifelong mental illness. He also contends that the cold, calculated and premeditated aggravator (CCP) was also attributable to Gill’s mental illness and should not have been heavily weighed by the trial court. Based on the record, we disagree with all these contentions and, as we explain below, conclude that when compared to other capital cases with similar aggrava-tors and similar mental mitigation, Gill’s sentence is proportionate.
 

 This Court reviews the death sentence for proportionality “regardless of whether the issue is raised on appeal.”
 
 England v. State,
 
 940 So.2d 389, 407 (Fla.2006);
 
 see also
 
 Fla. R.App. P. 9.142(a)(6). The death penalty is “reserved only for those cases where the most aggravating and least mitigating circumstances exist.”
 
 Terry v. State,
 
 668 So.2d 954, 965 (Fla.1996). Therefore, in deciding whether death is a proportionate penalty, the Court makes a “comprehensive analysis in order to determine whether the crime falls within the category of both the most aggravated and the least mitigated of murders, thereby assuring uniformity in the application of the sentence.”
 
 England,
 
 940 So.2d at 407-08 (quoting
 
 Anderson v. State,
 
 841 So.2d 390, 407-08 (Fla.2003) (citations omitted)). Accordingly, the Court considers the totality of the circumstances and compares the case with other similar capital cases.
 
 See Duest v. State,
 
 855 So.2d 33, 47 (Fla.2003). This analysis “is not a com
 
 *964
 
 parison between the number of aggravating and mitigating circumstances.”
 
 Poster v. State,
 
 564 So.2d 1060, 1064 (Fla.1990). Rather, this review entails a thoughtful and deliberate
 
 “qualitative
 
 review by this Court of the underlying basis for each aggravator and mitigator rather than a quantitative analysis.”
 
 Urbin v. State,
 
 714 So.2d 411, 416 (Fla.1998).
 

 Moreover, this Court “will not disturb the sentencing judge’s determination as to ‘the relative weight to give to each established mitigator’ where that ruling is ‘supported by competent substantial evidence.’ ”
 
 Blackwood v. State,
 
 777 So.2d 399, 412-13 (Fla.2000) (quoting
 
 Spencer v. State,
 
 691 So.2d 1062, 1064 (Fla.1996)). Here, Gill essentially contests the weight accorded the sentencing factors by the trial court and, in this respect, is asking this Court to reweigh the aggravators and miti-gators, which we will not do.
 

 The record clearly established that Gill is mentally ill and the State does not contest this fact. The trial court did not overlook or fail to find this uncontroverted mental mitigation, which was supported by competent, substantial evidence in the record. Cf
 
 . Nibert v. State,
 
 574 So.2d 1059, 1062 (Fla.1990) (finding the trial court erred in failing to find and weigh mitigation that was reasonably proven). To the contrary, the court recognized the fact that Gill was mentally ill and had a long history of mental and behavioral problems; and the trial court accorded the statutory mental mitigation substantial and great weight. The court expressly recognized that “[t]he Defendant has suffered a lifelong emotional disturbance frequently manifesting itself in anger or in inability to follow ordinary rules of behavior.” In addition to finding these two statutory mitigators, the trial court also found certain nonstatutory mitigation involving Gill’s arteriovenous malformation. The sentencing order states: “Defendant suffers from a brain anomaly. Defendant’s behavior may have been affected throughout his life by an arteriove-nous malformation which presses on the [amygdala], a gland which controls impulse behavior including rage.” However, the trial court concluded, based on competent, substantial evidence in the record, that the murder of Rosello wras neither impulsive nor due to uncontrollable rage. This non-statutory mitigator was given “weight, but not great weight.” We conclude that the trial court did not abuse its discretion in weighing the statutory and nonstatutory mitigation present in the record.
 
 See Smith v. State,
 
 998 So.2d 516, 527 (Fla.2008) (“We review the weight the tidal court ascribes to mitigating factors under the abuse of discretion standard.”). We will not reweigh these mitigators.
 

 Nor will we reweigh the three ag-gravators that the trial court found were proven: (a) Gill was under a life sentence for the Beverly Moore murder at the time of the Rosello murder; (b) Gill had previously been convicted of another capital felony, i.e., the murder of Beverly Moore; and (c) the killing was cold, calculated and premeditated. Competent, substantial evidence supports these aggravators and we conclude that the trial court did not abuse its discretion in assigning “great weight” to these aggravating factors.
 
 See Buzia v. State,
 
 926 So.2d 1203, 1216 (Fla.2006) (“The weight to be given aggravating factors is within the discretion of the trial court, and it is subject to the abuse of discretion standard.”).
 

 After conducting its analysis and weighing the sentencing factors, the court concluded that “[djespite the fact [that] RICARDO IGNACIO GILL is a deeply troubled individual with a long history of mental health problems, mental disturbances, suicidal impulses, and a life primarily spent in penal institutions ... the
 
 *965
 
 magnitude of Defendant’s aggravating factors outweigh[s] the magnitude of Defendant’s statutory mitigating factors and non-statutory mitigating factors.” We find no error in the weighing process conducted by the trial court. We turn now to the qualitative analysis and comparison to other capital cases that we are required to make.
 

 The existence of mental illness or mental mitigation does not automatically disqualify a defendant from receiving the death penalty. This Court has upheld death sentences in comparable cases in which the trial court found mental mitigation, including where the defendant has a history of mental illness or brain damage. In
 
 Rodgers v. State,
 
 3 So.3d 1127 (Fla.2009), a case somewhat similar procedurally to this case, Rodgers pled guilty, waived a sentencing jury, and waived mitigation during his penalty phase proceeding. Rodgers sought the death penalty because, as he explained, he did not want to spend the rest of his life in prison. We upheld the death sentence in
 
 Rodgers
 
 where one statutory mitigator and numerous nonstat-utory mitigators, including “an extensive history of mental illness,”
 
 id.
 
 at 1133, were weighed against two aggravating factors. Similarly, in
 
 Hauser v. State,
 
 701 So.2d 329 (Fla.1997), Hauser entered a plea of guilty to the strangulation murder, waived a penalty phase jury, and instructed his lawyer not to present mitigation.
 
 Id.
 
 at 330. Just as in this case, the trial court in
 
 Hauser
 
 met its obligation to consider mitigation contained in the record and proffered by counsel and found in mitigation that Hauser had a history of mental problems. The trial court weighed three ag-gravators against one statutory mitigator and four nonstatutory mitigators, including Hauser’s history of mental health problems since age fourteen, and imposed the death sentence.
 
 Id.
 
 We concluded that the sentence was proportionate and affirmed.
 

 In
 
 Davis v. State,
 
 2 So.3d 952 (Fla.2008),
 
 cert. denied,
 
 — U.S.-, 129 S.Ct. 2872, 174 L.Ed.2d 585 (2009), we upheld the death sentence as proportionate where the trial court found in mitigation that Davis suffered from both brain damage and chronic mental illness. In affirming, we concluded that there was no evidence that the murder was the result of emotional disturbance or severe mental illness.
 
 Id.
 
 at 965-66. Just as in
 
 Davis,
 
 there was no evidence in this case linking the Rosello murder to Gill’s brain anomaly or his history of chronic mental illness.
 

 Although these cases indicate the sentence in this case is proportionate, Gill contends that the circumstances in his case are comparable to those in a number of cases involving mental mitigation where this Court vacated the death sentence. We disagree that the circumstances are comparable. He first cites
 
 Cooper v. State,
 
 739 So.2d 82 (Fla.1999), which involved three aggravators (conviction of a violent felony committed several days after the murder, commission of murder during a robbery and for pecuniary gain, and CCP). These aggravators were weighed against substantial mitigation appearing in the record, including the fact that Cooper was only eighteen years old at the time of the murder, had no prior criminal activity, had brain damage, was borderline mentally retarded, and was mentally ill with paranoid schizophrenia. This Court found the death sentence disproportionate in
 
 Cooper
 
 because the evidence showed that it was not one of the least mitigated cases but, to the contrary, was one of the “most mitigated.”
 
 Id.
 
 at 86. In contrast, Gill was thirty-one years old when he committed the Rosello murder, and he had an average IQ. Moreover, Gill had an extensive criminal background at the time of the murder. Thus, the circumstances in
 
 Cooper
 
 are not comparable to those in the instant case and do not indicate that Gill’s sentence is disproportionate.
 

 
 *966
 
 Gill also cites
 
 Crook v. State,
 
 908 So.2d 350 (Fla.2005). There, in vacating the death sentence, we found as we did in
 
 Cooper
 
 that the case was “one of the most mitigated.”
 
 Id.
 
 at 356. Crook was only-twenty when he committed the murder, was borderline mentally retarded, and suffered an abusive childhood; and there was unrebutted evidence of frontal lobe brain damage and substance abuse problems. The evidence showed Crook’s brain damage, probably caused by being beaten with a pipe as a child, was directly related
 
 to
 
 lack of impulse control and rage, and that his damaged brain would have been affected by his consumption of beer, crack cocaine, and marijuana before the murder.
 
 Id.
 
 at 354-55. Significantly, the mental health experts in
 
 Crook
 
 related the rage and brutal conduct evident in the murder to Crook’s brain damage and mental deficiencies.
 
 Id.
 
 at 358. Even though there were three substantial aggravates, the record in
 
 Crook
 
 showed “overwhelming mitigation,
 
 especially the mental mitigation related to the circumstances of the crime.” Id.
 
 at 358 (emphasis added). In contest, in the instant case, none of the mental health experts tied Gill’s mental illness directly to the Rosello murder; and Dr. Waldman testified that, based on the circumstances of the crime, it was not likely that the arteriovenous malformation in Gill’s brain was causally connected to the Rosello murder. Therefore,
 
 Crook
 
 is not dispositive of the question of proportionality in the instant case.
 

 Several other cases Gill relies upon to argue that his sentence was not proportionate were single aggravator cases in which substantial mitigation was proven. “We have in the past affirmed death sentences that were supported by only one aggravating factor, but those cases involved either nothing or very little in mitigation.”
 
 Besaraba v. State,
 
 656 So.2d 441, 446 (Fla.1995) (quoting
 
 Songer v. State,
 
 544 So.2d 1010, 1011 (Fla.1989)). Gill’s case is not one in which only one aggravator was found and then weighed against substantial mitigation. The instant case involves three strong aggravates weighed against the mitigation found in this case, where no evidence tied the crime directly to Gill’s mental problems or brain malformation. Nor was there any evidence presented in this case that the Beverly Moore murder, which formed the basis for two of the aggravates in his ease, was causally linked to Gill’s mental illness such that the two aggravates should have been diminished in weight or not found.
 
 [17]
 
 The trial court found that the three heavily weighted aggravated outweighed the statutory and nonstatutory mental mitigation in the case, justifying the sentence of death. We will not disturb this finding. Accordingly, based on the foregoing, we hold that the sentence of death is proportionate in this case.
 

 Capital Sentencing and Ring
 

 Gill contends that the death penalty was improperly imposed on him in violation of the principles announced in
 
 Ring v. Arizona,
 
 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). The Supreme Court in
 
 Ring
 
 held that a capital defendant has a Sixth Amendment right to a jury determination of all facts on which the Legislature conditions an increase in the maximum punishment.
 
 Id.
 
 at 589, 122 S.Ct. 2428. Gill’s claim must fail. Gill waived a sentencing jury in this case and, because his waiver was knowing, intelligent and voluntary, he therefore waived any challenge to his sentencing based on
 
 Ring. See Bryant v. State,
 
 901 So.2d 810,
 
 *967
 
 822 (Fla.2005) (“Because appellant requested and was granted a penalty phase conducted without a jury, he has not and cannot present a claim attacking the constitutionality of Florida’s death penalty scheme under ...
 
 Ring.”
 
 (quoting
 
 Lynch v. State,
 
 841 So.2d at 366 n. 1)).
 
 [18]
 
 Accordr ingly, relief is denied on this claim.
 

 CONCLUSION
 

 After a review of the issues raised by Gill and our independent review of the sufficiency of the evidence and the knowing, intelligent, and voluntary nature of Gill’s plea, we affirm Gill’s conviction for first-degree murder and the sentence of death.
 

 It is so ordered.
 

 QUINCE, C.J., and PARIENTE, LEWIS, CANADY, POLSTON, and LABARGA, JJ., concur.
 

 PERRY, J., did not participate.
 

 [1]
 

 . We have jurisdiction.
 
 See
 
 art. V, § 3(b)(1), Fla. Const.
 

 [2]
 

 .
 
 Faretta v. California,
 
 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) (requiring a hearing to determine if an accused's unequivocal request for self-representation should be granted).
 

 [3]
 

 . In
 
 Ring,
 
 the Supreme Court held that a defendant has a Sixth Amendment right to have a jury find all facts upon which the Legislature conditions an increase in the maximum punishment.
 
 See
 
 536 U.S. at 589, 122 S.Ct. 2428.
 

 [4]
 

 .Because the conviction for which the death penalty was imposed in this case was the result of Gill's guilty plea, our mandatory review "shifts to the knowing, intelligent, and voluntary nature of that plea."
 
 Tanzi
 
 v.
 
 State,
 
 964 So.2d 106, 121 (Fla.2007) (quoting
 
 Winkles v. State,
 
 894 So.2d 842, 847 (Fla.2005));
 
 see also Guardado v. State,
 
 965 So.2d 108, 118 (Fla.2007);
 
 Lynch v. State,
 
 841 So.2d 362, 375 (Fla.2003);
 
 Ocha v. State,
 
 826 So.2d 956, 965 (Fla.2002).
 

 [5]
 

 .
 
 Miranda v. Arizona,
 
 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
 

 [6]
 

 . He also said he wrote and mailed "about ten letters” to his family and to his lawyers. He said the letters mentioned "an incident that you will be aware of by the time you get this letter.”
 

 [7]
 

 .
 
 Nelson v. State,
 
 274 So.2d 256 (Fla. 4th DCA 1973) (establishing procedure for handling complaint that appointed counsel is incompetent, adopted in
 
 Hardwick v. State,
 
 521 So.2d 1071, 1075 (Fla.1988)).
 

 [8]
 

 . The hearing was held in an unrelated Ala-chua County case that involved Gill, his same defense counsel and the same trial judge. Gill’s brief refers to this hearing as "a joint hearing in both cases.”
 

 [9]
 

 . The State presented evidence that the murder was committed while Gill was under a sentence of imprisonment and that Gill had previously been convicted of violent felonies by presentation of judgments and sentences, without objection, for Alachua County case number 1999-2277-CFA (Beverly Moore first-degree murder with a life sentence); Gilchrist County case number 21-2000-CF-0007 (attempted first-degree murder); Alachua County case number 2000-2185-CFA (battery on a law enforcement officer); Alachua County case number 1999-4240-CFA (battery on detention staff); Orange County case number CR86-5568 (burglary of a dwelling with battery); and Orange County case number CR86-6240 (burglary of a dwelling with an assault and robbery). The State also presented Gill's confession to the Florida Department of Law Enforcement and, without objection, a letter Gill sent to the prosecutor in the Moore case, letters Gill sent to Judge Morris both before and after the Rosello murder, and a letter Gill sent to the
 
 Gainesville Sun
 
 newspaper in which he admitted the Rosello murder and attempted to explain his reasons.
 

 [10]
 

 . The mitigation included: a defense memorandum filed in the Beverly Moore case by Gill's defense counsel; the mental mitigation contained in the sentencing order in the Beverly Moore case; numerous competency and mental health reports prepared during these proceedings and others; Alachua County Sheriff's records of three suicide attempts by Gill; a presentence investigation report for two Alachua County cases; Gill’s employment records; Gill’s medical records of treatment and hospitalizations during his early years; Dr. Alan Waldman's report regarding Gill’s arteriovenous brain malformation; and hospital records concerning the hemorrhage of Gill's arteriovenous malformation. The trial court also ordered and reviewed a presen-tence investigation report prepared for this case.
 

 [11]
 

 . The amygdala is “one of the four basal ganglia in each cerebral hemisphere that is part of the limbic system.”
 
 Merriam-Webster’s Collegiate Dictionary
 
 40 (10th ed.1994). The "limbic system” is a “group of subcortical structures (as the hypothalamus, hypo-
 
 *956
 
 campus, and
 
 the
 
 amygdala) of the brain that arc concerned esp. with emotion and motivation.”
 
 Merriam-Webster's Collegiate Dictionary
 
 675 (10th ed.1994).
 

 [12]
 

 . ' ‘Interietal" means "occurring between seizures.”
 
 Merriam-Webster’s Medical Dictionary
 
 364 (2006).
 

 [13]
 

 . Florida Rule of Appellate Procedure 9.142(a)(6) expressly provides that "[i]n death penalty cases, whether or not insufficiency of the evidence or proportionality is an issue presented for review, the court shall review these issues and, if necessary, remand for the appropriate relief.”
 
 Id.
 

 [14]
 

 . The court's competency determination was also made before Gill was allowed to represent himself pursuant to his
 
 Faretta
 
 requests. None of diese rulings has been challenged in this appeal.
 

 [15]
 

 . At the time Gill entered his guilty plea, the rule had not yet been amended to require the trial court to advise the defendant that a plea may subject a defendant to involuntary civil commitment as a sexually violent predator if the defendant has been convicted of a qualifying sexual offense.
 
 See
 
 Fla. R.Crim. P. 3.172(a)(9) (2005) (effective Oct. 1, 2005);
 
 In re Amendments To Florida Rule of Criminal Procedure 3.172,
 
 911 So.2d 763, 765 (Fla.2005).
 

 [16]
 

 . Although our mandatory review in this case shifted to the knowing, intelligent and voluntary nature of his guilty plea, we note that the factual basis provided for the plea, including Gill’s comprehensive confession to the Florida Department of Law Enforcement and his confession letters, provided competent, substantial evidence to support his conviction for the first-degree murder of Orlando Rosello.
 

 [17]
 

 . Testimony in the Moore case indicated that Gill told someone in advance of the murder that he was going to Moore's house to gel money and that if she did not cooperate, he would kill her.
 

 [18]
 

 . The standard of voluntariness for waiver of a sentencing phase jury is the same standard as that for waiving a jury trial.
 
 Bryant,
 
 901 So.2d at 822 (citing
 
 Tucker v. State,
 
 559 So.2d 218, 219 (Fla.1990)). The record reflects that Gill's waiver of a sentencing jury was made voluntarily in open court after a full colloquy discussing the rights and benefits he would be waiving by allowing the sentencing hearing to proceed before the judge alone.