739 So.2d 82 (1999)
Albert COOPER, Appellant,
v.
STATE of Florida, Appellee.
No. 86,133.
Supreme Court of Florida.
July 8, 1999.
Rehearing Denied September 13, 1999.
*83 Scott W. Sakin, Special Assistant Public Defender, Miami, Florida, for Appellant.
Robert A. Butterworth, Attorney General, and Randall Sutton, Assistant Attorney General, Miami, Florida, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty on Albert Cooper. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. We affirm the conviction but vacate the death sentence and remand for imposition of a life sentence without possibility of parole for twenty-five years.
On May 25, 1991, Albert Cooper and Tivan Johnson robbed a pawnshop owned by Charles Barker and shot Barker to death. Both men were later arrested and confessed to the crime. Cooper was charged with first-degree murder, armed robbery with a firearm, and armed burglary with a firearm, and was convicted as charged following a joint trial.
During the penalty phase of the trial, the defense presented testimony of two mental health experts, Drs. Eisenstein and Schwartz, and several relatives. Dr. Eisenstein testified that Cooper is brain-damaged, has a history of seizures, and suffers from frontal lobe dysfunction, which causes him to have impaired judgment and poor impulse control.[1] Dr. Eisenstein *84 further stated that at the time of the crime Cooper was under the influence of extreme mental or emotional disturbance and was under extreme duress or under substantial dominion of another person. The other defense mental health expert, Dr. Schwartz, testified that Cooper scored high on tests for both paranoia and schizophrenia and is borderline retarded.[2]
Relatives attested to the brutality Cooper suffered as a young child at the hands of his father (his mother divorced the man when Cooper was six or seven years old). One of Cooper's sisters testified that their father was an alcoholic who frequently beat the children and who on one occasion rammed Cooper's head into the refrigerator. Cooper's aunt testified that the father frequently whipped and beat Cooper and threatened the children with a gun. And a second sister testified that the father would frequently pull out his gun and threaten the children and that on one occasion he actually put the gun to young Cooper's head.[3]
The jury recommended death by an eight-to-four vote, and the court imposed a sentence of death based on three aggravating circumstances,[4] two statutory mitigating circumstances,[5] and several nonstatutory mitigating circumstances.[6] The court additionally imposed consecutive life sentences on the armed robbery and armed burglary convictions, with consecutive mandatory minimum terms for the firearm violations.
Cooper raises ten claims on appeal[7] but we find a single issue dispositive.[8] Our review of the record shows that *85 Cooper's death sentence is disproportionate when compared to other capital cases. This Court in Almeida v. State, No. 89,432, ___ So.2d ___, 1999 WL 506965 (Fla. July 8, 1999), explained the parameters of our proportionality review:
Almeida next claims that his death sentence is disproportionate. We agree. The Court in State v. Dixon, 283 So.2d 1 (Fla.1973), held that the death penalty is reserved for only the most indefensible of crimes:
Review of a sentence of death by this Court ... is the final step within the State judicial system. Again, the sole purpose of the step is to provide the convicted defendant with one final hearing before death is imposed. Thus, it again presents evidence of legislative intent to extract the penalty of death for only the most aggravated, the most indefensible of crimes.
Id. at 8. We later explained: "Our law reserves the death penalty only for the most aggravated and least mitigated murders." Kramer v. State, 619 So.2d 274, 278 (Fla.1993). Thus, our inquiry when conducting proportionality review is two-pronged: We compare the case under review to others to determine if the crime falls within the category of both (1) the most aggravated, and (2) the least mitigated of murders.
Almeida, slip op. at 21-22, ___ So.2d at ___.
In the present case, as noted above, the trial court found that three aggravators had been established, i.e., commission of a prior capital or violent felony (based on a robbery-murder Cooper committed several days after the present crime), commission during a robbery and for pecuniary gain, and CCP. This Court in other capital cases has affirmed the death penalty where comparable or less aggravation was present.[9] Thus, the first prong of the above standard appears to be satisfied.
The trial court additionally found that two statutory and several nonstatutory mitigators were established, including Cooper's low intelligence (i.e., Dr. Schwartz testified that Cooper's test results placed him in the borderline retarded category) and his abusive childhood. This Court has reversed the death penalty in cases where multiple aggravators were posed against comparable mitigation.[10] In addition to *86 the evidence of brutal childhood, brain damage, mental retardation, and mental illness (i.e., paranoid schizophrenia) in the present case, the defendant was eighteen years old at the time of the crime and had no criminal record prior to the present offense. We note that the jury vote was eight-to-four. On this record, we cannot conclude that the present crime is one of the least mitigated murders this Court has reviewed. In fact, the record shows just the oppositei.e., that this is one of the most mitigated killings we have reviewed. Accordingly, Cooper's death sentence is disproportionate.
Based on the foregoing, we affirm Cooper's convictions and sentences with the following exceptions. We vacate his death sentence and remand for imposition of a life sentence without possibility of parole for twenty-five years on the first-degree murder count. We reverse the imposition of consecutive mandatory minimum terms on the firearm counts and remand for imposition of concurrent mandatory minimum terms on those counts.[11]
It is so ordered.
SHAW, ANSTEAD and PARIENTE, JJ., and KOGAN, Senior Justice, concur.
WELLS, J., concurs in part and dissents in part with an opinion, in which HARDING, C.J., and OVERTON, Senior Justice, concur.
WELLS, J., concurring in part and dissenting in part.
I concur with the majority's decision to affirm appellant's conviction. I also concur that we must reverse the consecutive mandatory minimum terms on the firearm counts in favor of concurrent mandatory minimum terms. I dissent, however, from the majority's analysis of proportionality, and therefore also from the reversal of appellant's death sentence. I conclude that the majority's proportionality analysis is contrary to this Court's role in reviewing capital cases.
The majority's proportionality analysis erroneously assumes a sentencing role for this Court in this capital case by improperly dismissing in summary fashion the trial judge's in-the-courtroom evaluation of the penalty phase evidence. The fact of this assumption is made clear when the trial judge's evaluation of appellant's mitigation evidence is compared with this Court's characterization of the trial judge's evaluation. The trial court's sentencing order provides in pertinent part:

*87 a. The defendant has no significant history of prior criminal activity. Section 921.141(6)(a), Florida Statutes.

The evidence showed that, although the defendant had committed another homicide, robbery, burglary and kidnapping nineteen (19) days after the homicide of Charles Barker, he did not have a significant history of prior criminal activity prior to the Barker homicide. See Scull v. State, 533 So.2d 1137 (Fla. 1988).
b. The capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance. Section 921.141(6)(b), Florida Statute.

To support this mitigating circumstance, the defendant presented the testimony of Dr. Hyman Eisenstein, a board certified neuropsychologist. Dr. Eisenstein stated that his tests revealed that the defendant suffered from cognitive brain impairment and problems with frontal lobe functioning. He diagnosed the defendant as having a major mental illness (dementia) due to head trauma

Dr. Eisenstein's opinion on this mitigating circumstance was contradicted by the defendant's other psychologist, Dr. Gary Schwartz, who testified that he did not find this statutory mitigating circumstance to exist. Similarly, the State's expert, Dr. Eli Levy, did not find this mitigating circumstance to exist. He found no objective evidence to support the finding that the defendant suffered from any major mental illness. He rejected the finding of dementia due to head trauma because the defendant's medical records in which a CAT scan and EEG were performed did not support a finding of any injury to the brain. Dr. Levy also testified that if the defendant had a major mental illness at the time of the offense, his behavior would have shown it to exist. Dr. Levy's review of the evidence, in particular the defendant's statements, did not support such a finding. Dr. Gisella Puentes, a neuropsychologist, also testified that her testing of the defendant showed no frontal lobe impairment, and no evidence of dementia due to head trauma. She found that the defendant's statement, which showed good, detailed memory, indicated that he was not under the influence of an extreme mental or emotional disturbance at the time of the homicide.

There is simply very little basis to support Dr. Eisenstein's testimony that this mitigating factor exists. The other doctors' testimony as to this mitigating circumstance were more credible. Thus, the court rules that this mitigating circumstance, has not been reasonably established by the greater weight of the evidence; see Campbell v. State, 571 So.2d 415 (Fla.1990); and therefore, it does not exist or apply.
c. The defendant acted under extreme duress or under the substantial domination of another person. Section 921.141(6)(e), Florida Statutes.

To support this mitigating circumstance the defendant again relied on the testimony of Dr. Eisenstein. Dr. Eisenstein opined that because of the defendant's brain impairment, coupled with the physical and psychological abuse that he suffered from his father, and his drug abuse, the defendant was a person who was easily influenced by others to engage in behavior that was not socially acceptable. Dr. Eisenstein opined that because of the problems with his frontal lobe functioning, the defendant had used his mother as his "surrogate frontal lobe," and when he moved out of his mother's house, his codefendant, Tivan Johnson, became his "frontal lobe."

Dr. Eisenstein's opinion was again contradicted by the defendant's other expert, Dr. Schwartz, as well as the State's experts, Dr. Levy and Dr. Puentes, and various other witnesses. Dr. Schwartz *88 did not find this mitigating circumstance. Dr. Levy stated that there was nothing to suggest that the defendant acted under the domination of Johnson. He testified that the defendant never told him that he committed the murder because Johnson told him to do it. Dr. Puentes, who found no frontal lobe impairment, testified that there was nothing to suggest that the defendant was under the domination of another.
Renee Carey testified that, when the defendant lived with her and Tivan Johnson, they were on equal footing. She stated that Tivan was not a leader. Darlene Cooper, the defendant's sister, testified that he was the type of person who had his own mind.
Extreme duress as used in this statutory mitigating circumstance refers to provocation such as imprisonment or use of force or threats by the other person. Toole v. State, 479 So.2d 731 (Fla. 1988[1985]). There was no evidence that established the defendant was under duress by any other person. The court rules that Dr. Eisenstein's testimony on this mitigating circumstance was not credible, and thus there was no credible evidence to show that the defendant was under the substantial domination of Tivan Johnson, or any other person at the time of the homicide of Charles Barker. Therefore, the court finds that this mitigating circumstance does not exist or apply.
d. The capacity of the defendant to appreciate the criminality of his conduct or to conform this conduct to the requirements of the law was substantially impaired. Section 921.141(6)(f), Florida Statutes.

For the same reason that he based his opinion on the mitigating circumstances under Section 921.141(6)(b) & (e), Dr. Eisenstein likewise opined that the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. Dr. Eisenstein found that, due to the defendant's brain impairment and problems with his frontal lobe functioning, the defendant had no judgement, in that he could appreciate the criminality of his conduct, but could not conform his conduct to the requirements of the law.

Again, Dr. Eisenstein's opinion was contradicted by Dr. Schwartz, Dr. Levy and Dr. Puentes. Dr. Schwartz did not find this mitigating circumstance. Dr. Levy found that the defendant had the capacity to exercise judgement. Dr. Puentes also found that the defendant'[s] judgement was not impaired. Furthermore, Darlene Cooper testified that the defendant exercised very good judgement.
There was no evidence to indicate that the defendant suffered from a mental disturbance which interfered with, but did not obviate, his knowledge of right and wrong. State v. Dixon, 283 So.2d 1 (Fla.1973). The Court finds that Dr. Eisenstein's testimony was not credible. There was no credible evidence to show that the defendant was impaired in any manner. Thus, the court finds that this mitigating circumstance does not exist or apply.
e. The age of the defendant at the time of the crime. Section 921.141(6)(g), Florida Statutes.

At the time of the murder of Charles Barker, the defendant was eighteen (18) years old, having been born on December 17, 1972. Cooper v. State, 492 So.2d 1059 (Fla.1986). For age to be mitigating, or accorded any significant weight, it must be linked with some other characteristic of the defendant or the crime, such as immaturity or senility. Echols v. State, 484 So.2d 568 (Fla.1985).

The evidence showed that although the defendant was eighteen, there was nothing to establish any kind of immaturity, so as to make his age mitigating. Dr. Eisenstein opined that the defendant's IQ was 82, low average. Dr. *89 Schwartz opined that it was 77, in the borderline area. Dr. Levy, although acknowledging the other doctors' IQ scores, opined that the defendant was of average intelligence, that he had no intellectual deficits that caused him to behave as he did. Dr. Levy did not believe that the IQ scores showed the defendant's true innate ability, in that IQ tests learned information and does not measure a person's streetwise intelligence. Even Dr. Schwartz acknowledged that IQ tests are culturally biased. He stated that the defendant was capable of planning and premeditating the murder of Charles Barker, and that he was a person capable of making decisions. Furthermore, none of the defendant's family or friends testified that the defendant had any intellectual problems or was immature. In fact, Derek Lebron, testified that the defendant would help him with his school work, and was a pretty intelligent person. The court finds that, although the defendant was eighteen years old at the time of the crime the other factors as to his maturity outweigh his age and thus the court gives little weight to this mitigating factor.

f. The victim was a participant in the Defendant's conduct or consent to the act. Florida Statutes 921.141(6)(c).
The Defendant's attorney allege[s] that the Defendant's and co-Defendant's statements to police at the time of their arrest stated that Charles Barker on the date of his death, went for his gun before they did. The Court cannot find these statements but not withstanding if this was said, there is no evidence to this. The victim did not consent to being robbed or killed. The Court finds this mitigating circumstance does not exist.
SENTENCE
The jury recommended to this Court that it impose the death penalty upon the defendant for the First Degree Murder of Charles Barker. There are aggravating factors present, and there is [a] statutory mitigating circumstance, i.e., the defendant's lack of prior criminal history. There are also some nonstatutory mitigating circumstances, in particular, the defendant's low intelligence and his abusive childhood. After independently reviewing and weighing the evidence, [t]he Court finds that the results are overwhelmingly aggravating rather than mitigating. More than sufficient aggravating circumstances were proven beyond and to the exclusion of every reasonable doubt to justify the imposition of the sentence of death. The mitigating circumstances which exist are not significant or do not apply in this case to a degree which would cause them to mitigate the crime or the sentence. There are sufficient aggravating circumstances that exist to justify a sentence [of] death, which overwhelmingly outweigh any mitigating circumstances that are present. This Court independently finds and concurs with the advisory sentence and recommendation entered by the jury. Therefore, the Court sentences Albert Cooper, as to Count 1, for the First Degree Murder of Charles Barker, to death.
(Emphasis added.) The trial judge in this case did, in an exemplary way, the difficult judicial labor which this Court mandated in Campbell v. State, 571 So.2d 415 (Fla. 1990). We recently said in Porter v. State, 723 So.2d 191, 196 (Fla.1998):
As we have repeatedly stressed, a trial judge's weighing of statutory aggravating factors and statutory and nonstatutory mitigating circumstances is the essential ingredient in the constitutionality of our death penalty statute. [Grossman v. State, 525 So.2d 833, 839 (Fla. 1988)]. It is for this very reason that we have found it essential for trial judges to adequately set forth their weighing analyses in detailed written orders. Walker v. State, 707 So.2d 300, *90 318-19 (Fla.1997); Campbell v. State, 571 So.2d 415, 419 (Fla.1990).
See also Brown v. Wainwright, 392 So.2d 1327, 1331 (Fla.) ("This Court's role after a death sentence has been imposed is `review,' a process qualitatively different from sentence `imposition.'"), cert. denied, 454 U.S. 1000, 102 S.Ct. 542, 70 L.Ed.2d 407 (1981); State v. Dixon, 283 So.2d 1, 7 (1973) ("[T]he weighing process is left to the carefully scrutinized judgment of jurors and judges.").
Despite this clear precedent regarding the role of the trial judge and the role of this Court in capital cases, and despite the fact that the trial judge independently weighed the relevant factors and found that the aggravation outweighed the mitigation, the majority opinion states:
The trial court additionally found two statutory and several nonstatutory mitigators were established, including Cooper's low intelligence (i.e., Dr. Schwartz testified that Cooper's test results placed him in the borderline retarded category) and his abusive childhood.... In addition to the evidence of brutal childhood, brain damage, mental retardation, and mental illness (i.e., paranoid schizophrenia) in the present case, the defendant was eighteen years old at the time of the crime and had no criminal record prior to the criminal offense. We note the jury vote was eight-to-four. On this record, we cannot conclude that the present crime is one of the least mitigated murders this Court has reviewed. In fact, the record shows just the opposite-i.e., that this is one of the most mitigated....
This analysis is nothing more than this Court substituting its judgment as to the weight to be given to mitigation evidence under the guise of proportionality review. If this Court's majority is free to ignore a trial judge's weighing of the aggravators and the mitigators, then what we are requiring of trial judges is a hollow exercise. Proportionality review does not provide the majority with a license to pick and choose from a cold record the conflicting evidence which the majority believes is persuasive and to cast aside the evaluation of the trial judges based upon live, in-the-courtroom evidence. There is no support in this Court's precedent for the sentencing role the present majority has assumed. Contrary to the majority, I find that appellant's death sentence is proportional when compared to factually similar cases in which we have affirmed a death sentence. See Lowe v. State, 650 So.2d 969 (Fla. 1994).
HARDING, C.J., and OVERTON, Senior Justice, concur.
NOTES
[1] Dr. Eisenstein also attested to the following:

Cooper is brain-damaged from beatings and head trauma suffered as a small child (his father would beat him and throw him against the wall and against the refrigerator); and Cooper has cognitive brain impairment.
[2] Dr. Schwartz also attested to the following: Cooper scored high on tests for substance abuse, thought disturbance, antisocial tendency, and poor self-esteem; Cooper suffers from neurological deficiency; and Cooper suffered abuse as a young childhis father on one occasion rammed him head-first into the refrigerator.
[3] In rebuttal to the defendant's penalty-phase case, the State presented the testimony of two mental health experts, Drs. Levy and Aguila-Puentes, and several acquaintances of Cooper.
[4] The court found that the following aggravating circumstances were established: The defendant had committed a prior capital or violent felony; the present murder was committed during a robbery and for pecuniary gain; and the murder was committed in a cold, calculated, and premeditated manner (CCP).
[5] The court found that the following statutory mitigating circumstances were established: The defendant had no significant history of prior criminal activity; and the defendant was eighteen years old at the time of the crime.
[6] The court found that the following nonstatutory mitigating circumstances were established: The defendant had low intelligence; and the defendant had an abusive childhood.
[7] The defendant claims that the trial court erred on the following points: (1) in admitting Cooper's confession; (2) in allowing the State to introduce evidence concerning a collateral criminal matter; (3) in denying Cooper's motion for severance; (4) in denying Cooper's motion for mistrial after jurors witnessed Cooper in shackles; (5) in instructing the jury during voir dire that they must recommend death if they find that the aggravating circumstances outweigh the mitigating circumstances; (6) in finding CCP; (7) in failing to give a requested instruction concerning Cooper's age; (8) in admitting penalty phase evidence concerning a collateral crime; (9) in failing to adequately consider evidence of Cooper's drug use; (10) in imposing consecutive mandatory minimum terms on the armed robbery and burglary counts.
[8] Cooper's four guilt-phase issues, claims (1)(4), are without merit. In claim (1), Cooper argues that the third warning on the Metro-Dade rights form (i.e., "If you want a lawyer to be present during questioning, at this time or any time thereafter, you are entitled to have a lawyer present. Do you understand?") is insufficient. This warning, however, tracks the language of Miranda. See Miranda v. Arizona, 384 U.S. 436, 479, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) ("[The suspect] must be warned prior to any questioning ... that he has the right to the presence of an attorney."). In claim (2), Cooper contends that the jury was improperly told of his involvement in another criminal matter. The record, however, shows that jurors were never told that Cooper was under arrest or a suspect in another crime, but only that he and Johnson and six or seven other witnesses were being interviewed on another matter when police began questioning Cooper about the present crime. The testimony was relevant to explain the time lag between the time Cooper arrived at the station house and the time he confessed to the present crime. In claim (3), Cooper argues that the trial court erred in denying his motion for severance based on the rebuttal testimony of Renee Carey. However, Carey's testimony (wherein she said that Cooper admitted to her his involvement in the present crime), was offered by the State in rebuttal to codefendant Johnson's testimony and would have been admissible as substantive evidence against Cooper if the codefendants had been tried separately. See § 90.803, Fla. Stat. (1991). In claim (4), Cooper contends that reversal is required because jurors observed him in shackles. Cooper, however, was not tried in shackles, and the fact that jurors may have inadvertently seen him in shackles when he was being transported to or from the courtroom does not require reversal. See, e.g., Jackson v. State, 545 So.2d 260 (Fla. 1989).
[9] See, e.g., Heath v. State, 648 So.2d 660 (Fla. 1994) (affirming death sentence for shooting death of victim where aggravators included commission during a robbery, and prior murder); Cook v. State, 581 So.2d 141 (Fla.1991) (affirming death sentence for shooting death of victim where aggravators included commission during a robbery, and prior murder); King v. State, 436 So.2d 50 (Fla.1983) (affirming death sentence for shooting death of victim where aggravators included HAC and prior ax-slaying of another victim); Harvard v. State, 414 So.2d 1032 (Fla.1982) (affirming death sentence for shooting death of victim where aggravators included HAC and prior shooting of another victim).
[10] See, e.g., Urbin v. State, 714 So.2d 411 (Fla.1998) (vacating death sentence for robbery-murder where multiple aggravatorsincluding prior violent felonywere weighed against substantial mitigation including impaired capacity, deprived childhood, and youth); Curtis v. State, 685 So.2d 1234 (Fla. 1996) (vacating death sentence for shooting death of store clerk where multiple aggravators including attempted murder of second store clerkwere weighed against substantial mitigation including remorse and youth), cert. denied, 521 U.S. 1124, 117 S.Ct. 2521, 138 L.Ed.2d 1022 (1997); Morgan v. State, 639 So.2d 6 (Fla.1994) (vacating death sentence for bludgeoning death of homeowner where multiple aggravators were weighed against copious mitigation including brain damage and youth); Livingston v. State, 565 So.2d 1288 (Fla.1988) (vacating death sentence for shooting death of store clerk where multiple aggravators were weighed against substantial mitigation including abusive childhood, diminished intellectual functioning, and youth). See also Knowles v. State, 632 So.2d 62 (Fla. 1993) (vacating death sentence for shooting deaths of defendant's father and neighborhood child where one aggravator was weighed against substantial mitigation including brain damage and impaired capacity).
[11] This Court addressed the stacking of mandatory minimum terms in State v. Christian, 692 So.2d 889 (Fla.1997):

As a general rule, for offenses arising from a single episode, stacking is permissible where the violations of the mandatory minimum statutes cause injury to multiple victims, or multiple injuries to one victim. The injuries bifurcate the crimes for stacking purposes.
Id. at 890-91 (footnotes omitted) (emphasis added). We further explained that "[e]ach violation [of the mandatory minimum statute] must cause a separate injury." Id. at 890 n. 2. In the present case, the firearm violation under the armed robbery count did not cause an injury to the victim that was separate and distinct from the injury caused by the firearm violation under the armed burglary count.