# Supreme Court of Florida

———————

No. SC12-876

———————

**TERRANCE TYRONE PHILLIPS,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[November 17, 2016]

PER CURIAM.

This case is before the Court on appeal from two judgments of conviction of first-degree murder and two sentences of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. Terrance Phillips (Phillips), was convicted in Duval County of the murders of Mateo Hernandez-Perez and Reynaldo Antunes-Padilla. The jury also convicted Phillips of one count each of armed burglary, attempted armed robbery, and conspiracy to commit armed robbery. Phillips now pursues the direct appeal of his convictions and sentences which are subject to automatic review by this Court. For the reasons explained below, we affirm Phillips's judgments of conviction. However, because we conclude that Phillips's death sentences are a

disproportionate penalty in this case, we remand this case to the trial court with instructions that each of Phillips's death sentences be reduced to a sentence of life imprisonment. We first set forth the facts of this case, and we then address Phillips's challenges to his convictions. We conclude by evaluating the proportionality of Phillips's death sentences.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

The evidence introduced at trial revealed that on the afternoon of December 24, 2009, in Jacksonville, Barbara "Cookie" Anders, Shanise Bing, and Tanequa "Kiwi" Dwight walked from the Lighthouse Bay Apartments where Anders lived to a nearby convenience store. Around the same time, three men, Aurelio Salgado, Manuel Ton, and Mateo Hernandez-Perez drove to the same store to buy beer. The three men also lived at the Lighthouse Bay Apartments and were roommates.

At the store, Dwight asked the men for change for a $5 bill, and Salgado gave her five $1 bills. Dwight also gave them a cell phone number that belonged to Anders. The men eventually returned to their apartment.

After the women left the convenience store, they rode the bus to another area of town. Later, Anders called her boyfriend, Antonio Baker, to come and get them. Baker drove to meet Anders, Bing, and Dwight. Baker was accompanied by Phillips, AKA "Man." Anders and Bing got into the car with Baker and Phillips, and Dwight got into another car driven by Phillips's brother.

While in the car, Hernandez-Perez called Anders, with whom he wanted to have sex. Because Hernandez-Perez had a limited ability to speak English, Salgado spoke with Anders on his behalf. Salgado told Anders that Hernandez-Perez wanted to have sex with her and asked her to come over to their apartment, unit number E-44 at the Lighthouse Bay Apartments.

After Anders ended the call, she, Bing, Baker, and Phillips discussed robbing the men. They planned that Anders and Bing would enter the apartment pretending to want to have sex with the men, and Baker and Phillips would come in and rob them.

Anders, Bing, Baker, and Phillips returned to the apartment complex and parked near Anders's building, building F. Shortly before 6 p.m., Anders and Bing walked to building E and up the stairs to apartment E-44. At the time, Hernandez-Perez, Ton, and Salgado were in the apartment and had been joined by their downstairs neighbor, Reynaldo Antunes-Padilla. When Anders and Bing entered the apartment, Anders talked with Hernandez-Perez about having sex, and Hernandez-Perez offered her money to do so. Anders was dissatisfied with the amount of money offered, and the two never reached an agreement. Anders made a phone call, and shortly thereafter, Baker and Phillips entered the apartment through the front door.

Phillips, who was wearing a hoodie and carrying a .9 mm firearm, immediately approached Hernandez-Perez and placed a gun against his head. Hernandez-Perez moved Phillips's hand away from his head, and a fight ensued, with Salgado and Antunes-Padilla trying to help Hernandez-Perez. In the meantime, Ton fled the scene, and Bing left the apartment. Anders also left the apartment, but she hit one of the men on the head with a bottle before doing so. Salgado also testified that the unarmed male intruder (Baker) hit him on the head with a bottle. Salgado ran out of the apartment, and according to Salgado, Baker followed behind.

Bing, Anders, and Salgado all heard gunshots after they left the apartment. Bing was already downstairs when she heard the gunshots. Anders and Salgado both heard the gunshots while running away from the apartment. Anders, Bing, Baker, and Phillips all met at the car and drove away from the apartment complex. Phillips, who returned to the car with the gun, explained that he lost his shoe in the apartment, and that the gun fired when he dropped it.

Emergency personnel were dispatched to the crime scene shortly after 6 p.m., where they located gunshot victims Hernandez-Perez and Antunes-Padilla, and Salgado, who sustained a head injury. Hernandez-Perez was shot twice in the left leg, and Antunes-Padilla was shot once in the chest. Hernandez-Perez and

Antunes-Padilla were transported to the hospital but died from their injuries. Salgado was treated at the hospital for his head injury.

The autopsy of Hernandez-Perez revealed that he sustained two gunshot wounds, one in the left hip and the other on the left thigh. The bullet that entered the hip area caused a fatal injury to his iliac blood vessel and, traveling from front to back, exited through the left buttock. Hernandez-Perez was shot at close to intermediate range, and stippling on his skin indicated that the firearm was two to three feet from his body when he was shot.

The autopsy of Antunes-Padilla revealed that he was shot at close range within a few inches and sustained one fatal gunshot wound. The gunshot wound entered his chest and traveled through his right lung, spine, and aorta before it exited his body.

The murder investigation yielded multiple pieces of physical evidence, including a cell phone that was recovered from one of the victims. Information retrieved from this phone was linked to Anders. Days after the murders, Anders and Bing were separately interviewed by law enforcement. Both women admitted their involvement in the incident and also indicated that Phillips and Baker were involved. Later, cell phone records demonstrated that during the minutes before and after the shootings, Baker, Phillips, and Anders all made or received phone calls in close proximity to the apartment complex.

Multiple witnesses identified Phillips as the gunman.  At trial, Anders testified that Phillips entered the apartment with a .9 mm firearm and that he placed it against Hernandez-Perez's head.  Bing also testified that Phillips was armed when he entered the apartment.  Salgado testified that the larger of the two men was armed and placed a gun against Hernandez-Perez's head upon entering the apartment.  The smaller man was unarmed.[1]  Anders testified that after the group returned to the car, Phillips was still in possession of the gun.  Anders and Bing testified that Phillips explained that he lost his shoe in the apartment, and that his gun fired in the apartment when he dropped it.

Consistent with the three gunshots sustained by the victims, three shell casings were recovered from the crime scene.  Additionally, bullets were recovered from the crime scene and at the hospital after the victims were transported there.  An analysis of the casings and the bullets revealed that they were consistent with having been fired from a .9 mm Luger Hi-Point firearm.

DNA analysis was conducted on a Nike tennis shoe that was retrieved from the crime scene.  The DNA analysis revealed that Phillips's profile matched or was included at all thirteen markers of the DNA mixture found on the shoe, excluding 99.99 percent of Caucasians, African-Americans, and Southeastern Hispanics.

---

1. At the time, Phillips was 5'8" tall and weighed 215 pounds.  Baker was 5'6" tall and weighed 150 pounds.

## Verdict and Penalty Phase

Phillips was tried by jury for two counts of first-degree murder, and one count each of armed burglary, attempted armed robbery, and conspiracy to commit armed robbery. The jury returned guilty verdicts on all counts. On a special verdict form, the jury found as to each murder that Phillips was guilty of both premeditated murder and felony murder. The jury also found that Phillips committed each murder while engaged in the commission or attempted commission of a burglary and/or robbery.

During the penalty phase, the State presented victim impact testimony from relatives of the victims. The State also presented the testimony of the Florida Department of Corrections's records custodian, who testified regarding the terms of a felony probation sentence that Phillips began serving less than two months before the murders for illegal possession of a controlled substance. Prior to the custodian's testimony, the court read a stipulation entered into by the State and the defense that Phillips was on felony probation at the time of the subject crimes.

At the beginning of the defense's penalty phase case, the court also read a stipulation entered into by the State and the defense that Phillips was eighteen years old at the time of the subject crimes. The defense then presented the testimony of several of Phillips's family members and the testimony of a mental health expert, Dr. Michael D'Errico.

Dr. D'Errico testified that he conducted an evaluation of Phillips that included administering the WAIS-IV standardized intelligence test, on which Phillips scored a 76. Dr. D'Errico also reviewed school records, which disclosed Phillips's involvement in special education classes for specific learning disabilities from the first grade until he dropped out of school in the ninth grade. The records also indicated that Phillips participated in speech therapy for a speech impediment between grades one and four.

Dr. D'Errico testified at length regarding Phillips's intellectual capacity. He testified that Phillips's IQ score of 76 placed him in the fifth percentile, meaning that ninety-five percent of those tested would score higher than Phillips. Dr. D'Errico characterized Phillips as having significantly subaverage intelligence that placed him in the borderline range of intellectual functioning. Dr. D'Errico observed that the results of the evaluation and testing he conducted were consistent with psychometric intelligence testing performed on Phillips while he was in grade school.

Dr. D'Errico also testified that individuals like Phillips who function within the borderline range "are typically easily influenced by their peers." He described people who are enrolled in special education programs as just wanting to be normal. Thus, he opined, if Phillips's peer group engaged in criminal activity, he would be susceptible to participating because he wanted to fit in. Moreover,

Dr. D'Errico concluded that in addition to Phillips's limited intellectual functioning, Phillips's speech impediment and his age of eighteen at the time of the murders would make him more vulnerable to wanting to fit in with his peers.

Family members testified that Phillips had a speech impediment since he was a baby. He spoke slowly, had to think about his words before speaking, and struggled to pronounce words. He often had to repeat himself so that others would understand what he was saying.

Phillips's family described him as helpful, respectful, kindhearted, and obedient. He had a good attitude and respected authority. Phillips went to church and played football on the church football team where he was a team captain. Phillips's cousin testified that Phillips tried to encourage him to do the right thing and avoid getting into trouble.

Phillips's father was shot and killed when he was very young. Family members observed him as being quiet and withdrawn afterwards. Phillips struggled with the loss of his father and did not receive counseling. As Phillips grew, there were allegations that he was not getting proper supervision. In 2002, Phillips burned himself on the face with a hot iron because he wanted to see if it was hot. This incident led to an investigation of his living environment. Phillips's godfather was also concerned about the level of supervision Phillips was getting,

and this concern led him to contact the authorities. When Phillips was a teenager, he spent a significant amount of time in a high crime area.

Sentencing

At the conclusion of the penalty phase, by a vote of eight to four, the jury returned recommendations that Phillips be sentenced to death for each murder. The court proceeded to sentencing after conducting a Spencer[2] hearing which consisted of additional argument. In its sentencing order, the trial court found the following aggravating circumstances as to each murder: (1) prior violent felony (based on the contemporaneous murder of the other victim)—great weight; (2) capital felony committed while defendant on felony probation (based on a conviction for drug possession)—great weight; and (3) capital felony committed during the commission of a robbery or burglary—great weight.

The trial court found one statutory mitigating circumstance: age of the defendant (eighteen years) at the time of the crime—considerable weight. The trial court also found the following nonstatutory mitigating circumstances: (1) defendant has a borderline IQ (76), a severe speech impediment, and a learning disability—moderate weight as to IQ and learning disability and slight weight as to the speech impediment; (2) defendant is easily influenced by others—slight

---

2. Spencer v. State, 615 So. 2d 688 (Fla. 1993).

- 10 -

weight; (3) defendant was impacted by the murder of his father—little weight; (4) defendant was a loving and caring family member, steadfast friend, and good neighbor—some weight as to each characteristic; (5) defendant was a good sportsman—slight weight; (6) defendant grew up in a neighborhood with a high crime rate—some weight; (7) defendant was neglected/abused as a child and did not receive the professional mental help he needed—some weight as to each; (8) defendant was/is reverent and God-fearing—slight weight; and (9) defendant was respectful during court proceedings—slight weight.

The trial court also rejected the following mitigation as not proven: the defendant acted under extreme duress or under the substantial domination of another person. Phillips timely appealed his convictions and sentences.

## ANALYSIS

In this appeal, Phillips raises multiple issues challenging his convictions for first-degree murder and his sentences of death: (1) whether Phillips's death sentences are disproportionate; (2) whether improper victim impact evidence was introduced during the penalty phase; (3) whether sufficient evidence exists to support the convictions for first-degree premeditated murder; (4) whether the State failed to disclose material and exculpatory evidence and whether the State permitted the introduction of false or misleading evidence (Brady/Giglio claims); (5) whether Phillips's death sentences violate the Sixth Amendment; and

- 11 -

(6) whether Hall v. Florida, 134 S. Ct. 1986 (2014), requires that Phillips be allowed to demonstrate that he is intellectually disabled.

We first turn to Phillips's guilt phase challenges. Because we conclude that Phillips's Brady and Giglio claims are not properly before this Court, we deny them without prejudice to be raised in a motion for postconviction relief. See Duest v. State, 855 So. 2d 33, 39-40 (Fla. 2003). Consequently, as to the guilt phase, we address only the sufficiency of the evidence. We then turn to the penalty phase, where, in light of our conclusion that Phillips's death sentences are disproportionate, we address only Phillips's proportionality claim.

**Guilt Phase**

Sufficiency of the Evidence

Phillips argues that there is insufficient evidence to support the jury's verdicts convicting him of first-degree premeditated murder. Although he does not expressly challenge his felony murder convictions on sufficiency grounds, this Court must independently evaluate each death case for sufficiency of the evidence relied upon to convict the defendant. See Caylor v. State, 78 So. 3d 482, 500 (Fla. 2011). "In appeals where the death penalty has been imposed, this Court independently reviews the record to confirm that the jury's verdict is supported by competent, substantial evidence." Davis v. State, 2 So. 3d 952, 966-67 (Fla. 2008). "In conducting this review, [this Court] view[s] the evidence in the light most

favorable to the State to determine whether a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt." Rodgers v. State, 948 So. 2d 655, 674 (Fla. 2006) (citing Bradley v. State, 787 So. 2d 732, 738 (Fla. 2001)).  As we explain, competent, substantial evidence supports his convictions for premeditated and felony murder.  We first turn to Phillips's conviction for first-degree premeditated murder.

## Premeditated Murder

"Premeditation is the essential element which distinguishes first-degree murder from second-degree murder." Coolen v. State, 696 So. 2d 738, 741 (Fla. 1997) (citing Wilson v. State, 493 So. 2d 1019, 1021 (Fla. 1986)).  The law does not require that the premeditation be formed at a specific time prior to the killing.  Rather, "[p]remeditation is defined as more than a mere intent to kill; it is a fully formed conscious purpose to kill.  This purpose to kill may be formed a moment before the act but must also exist for a sufficient length of time to permit reflection as to the nature of the act to be committed and the probable result of that act." Bigham v. State, 995 So. 2d 207, 212 (Fla. 2008) (citations omitted).  The State relied on circumstantial evidence to prove premeditation.  We have explained:

> Premeditation, like other factual circumstances, may be established by circumstantial evidence.  Evidence from which premeditation may be inferred includes such matters as the nature of the weapon used, the presence or absence of adequate provocation, previous difficulties between the parties, the manner in which the homicide was committed and the nature and manner of the wounds

- 13 -

inflicted. It must exist for such time before the homicide as will enable the accused to be conscious of the nature of the deed he is about to commit and the probable result to flow from it in so far as the life of his victim is concerned.

Larry v. State, 104 So. 2d 352, 354 (Fla. 1958).

"Where the evidence is purely circumstantial, there must be sufficient evidence establishing each element of the charged offense which also excludes the defendant's reasonable hypothesis of innocence." Kocaker v. State, 119 So. 3d 1214, 1224 (Fla. 2013). Phillips's hypothesis of innocence is that the victims were accidentally shot during the brawl. He also told his codefendants upon returning to the car after the shootings that the gun fired when he dropped it on the ground.

The State relied on the following circumstantial evidence of premeditation: (1) Phillips brought a gun to the crime scene; (2) Phillips was the only one with a gun; (3) Phillips placed the gun against Hernandez-Perez's head upon entering the apartment; (4) before the victims were shot, Phillips's codefendants left the apartment; and (5) after the codefendants left, Hernandez-Perez was shot twice in the leg, and Antunes-Padilla was shot once in the chest.

Phillips maintains that this evidence does not support premeditation. Rather, he argues that the shootings were the haphazard result of a struggle between Phillips and the victims. However, Phillips's hypothesis of innocence, that the shootings were accidental, is inconsistent with three gunshots hitting two separate targets. Three shell casings were recovered at the crime scene, and the victims

- 14 -

sustained a total of three gunshot wounds.  Thus, despite the melee that occurred in the apartment, all of the bullets fired from the gun entered the victims' bodies.  Given these facts, we conclude that there is competent, substantial evidence of premeditation.

## Felony Murder

Moreover, competent, substantial evidence supports Phillips's conviction for felony murder.  The murders occurred during the course of a planned robbery, during which Phillips possessed the gun and was seen placing it against the head of victim Hernandez-Perez.  Phillips was the only one of the defendants who remained in the apartment at the time of the shooting, and the gun was still in his possession when he returned to the car to meet his companions.  Anders testified that Phillips had a .9 mm weapon, and the firearms expert testified that the projectiles and the shell casings retrieved were all consistent with having been fired from a .9 mm Luger firearm and were all fired from the same weapon.  Moreover, the State introduced substantial DNA evidence linking Phillips to a shoe that was recovered from the crime scene, and Phillips told Anders and Bing moments after the murders that he lost his shoe in the apartment.  Thus, competent, substantial evidence supports the felony murder conviction.

## Penalty Phase

As we turn to the penalty phase, we address only Phillips's proportionality claim, as it is dispositive. "In performing a proportionality review, a reviewing court must never lose sight of the fact that the death penalty has long been reserved for only the most aggravated and least mitigated of first-degree murders." Urbin v. State, 714 So. 2d 411, 416 (Fla. 1998) (citing State v. Dixon, 283 So. 2d 1, 7 (Fla. 1973)). In this case, the trial court found three aggravating circumstances: (1) prior violent felony based on the contemporaneous murder of the other victim; (2) capital felony committed while defendant was on felony probation; and (3) capital felony committed during the commission of a robbery or burglary. The court found as a statutory mitigating circumstance that Phillips was eighteen years old at the time of the crimes. The court also found multiple nonstatutory mitigating circumstances. Notably, this nonstatutory mitigation included Phillips's borderline IQ, learning disability, and childhood neglect.

"Because death is a unique punishment, it is necessary in each case to engage in a thoughtful, deliberate proportionality review to consider the totality of circumstances in a case, and to compare it with other capital cases. It is not a comparison between the number of aggravating and mitigating circumstances." Porter v. State, 564 So. 2d 1060, 1064 (Fla. 1990) (citation omitted). This Court's proportionality review involves "a comprehensive analysis in order to determine

whether the crime falls within the category of both the most aggravated and the least mitigated of murders, thereby assuring uniformity in the application of the sentence." Offord v. State, 959 So. 2d 187, 191 (Fla. 2007) (quoting Anderson v. State, 841 So. 2d 390, 407-08 (Fla. 2003)). "This entails 'a qualitative review . . . of the underlying basis for each aggravator and mitigator rather than a quantitative analysis.' " Id. (quoting Urbin, 714 So. 2d at 416). Our qualitative review reveals that this case is not among the most aggravated and the least mitigated of first-degree murder cases because the totality of the circumstances includes substantial mitigation that ultimately renders the death penalty a disproportionate punishment.

During the penalty phase, Dr. D'Errico testified that Phillips, who was eighteen years old at the time of the murders, has significantly subaverage intelligence. During his evaluation of Phillips, Dr. D'Errico administered a standardized IQ test, on which Phillips scored a 76. Phillips's score falls within the borderline range of intellectual functioning and places him in the bottom 5% of the population. While in school, Phillips received special services to address a learning disability, and he received therapy for a lifelong speech impediment that affected his ability to communicate with others. Dr. D'Errico testified that as a result of Phillips's intellectual limitations, his behavior would be guided by his desire to fit in and be normal, and Phillips would be easily influenced by his peers.

We recognize that the statutory mitigating circumstance—Phillips's age of eighteen at the time of the murders—is an extremely significant mitigator. Indeed, eighteen years of age is the bare minimum age at which a person convicted of first-degree murder can be eligible for the death penalty. See Roper v. Simmons, 543 U.S. 551 (2005).

Further, Phillips functioned with a significantly subaverage intelligence that rendered him especially susceptible to the influence of others. Thus, not only was Phillips subject to the vulnerability of his youth, this vulnerability was compounded by the unrebutted evidence of his borderline IQ and significantly subaverage intelligence. Phillips's mental health mitigation, coupled with the fact that he was eighteen at the time of the murders, constitutes extremely compelling mitigation. Given the totality of the circumstances, we conclude that the homicides at issue here are not among the least mitigated of first-degree murders.

The facts of this case closely parallel those of Cooper v. State, 739 So. 2d 82 (Fla. 1999), a case where we concluded that the death penalty was a disproportionate punishment despite the presence of the prior violent felony aggravator. In Cooper, the eighteen-year-old defendant was convicted of first-degree murder, armed robbery with a firearm, and armed burglary with a firearm. Id. at 83. The jury recommended by a vote of eight to four that Cooper be sentenced to death, and the trial court imposed a death sentence following a finding

of three aggravating circumstances: (1) the defendant had committed a prior capital or violent felony; (2) the murder was committed during a robbery and for pecuniary gain; and (3) the murder was cold, calculated, and premeditated (CCP). Id. at 85. As statutory mitigation, the trial court found that: (1) the defendant had no significant history of prior criminal activity; and (2) the defendant was eighteen years old at the time of the crime. Id. at 84 n.5. The court found as nonstatutory mitigation that Cooper had low intelligence and that he had an abusive childhood. Id. at 85. Cooper was characterized by a mental health expert as "borderline retarded." Id. at 84. On direct appeal, emphasizing the substantial mitigation presented, this Court concluded that Cooper's death sentence was disproportionate and reduced Cooper's death sentence to a sentence of life imprisonment.

Cooper is strikingly similar to the present case in several key respects: (1) Cooper was eighteen years old at the time of the murder; (2) the murder was also committed during the course of a robbery; (3) Cooper's prior violent felony aggravator was also based on a murder conviction (not a contemporaneous one, but one committed days after the murder at issue); and (4) one of Cooper's mental health experts testified that he had low intellectual functioning. Id.

In light of these similarities, Cooper informs our conclusion that Phillips's death sentences are disproportionate. Like defendant Cooper, Phillips was eighteen years old at the time of the murders, and he possessed limited intellectual

functioning.  Additionally, the prior violent felony and murder during the course of a robbery or burglary aggravators applied in both cases.  However, Phillips's case is actually less aggravated than Cooper.  In Cooper, the third aggravator was CCP, which this Court has repeatedly acknowledged as one of the weightiest aggravators.  In contrast, the third aggravator in Phillips's case was that he was on felony probation at the time of the murders.  Less than two months prior to the murders, Phillips was placed on felony probation; however, he was sentenced to probation for drug possession.  Thus, in light of Cooper, we conclude that the death penalty is a disproportionate punishment.  Given the totality of the circumstances, sentences of life imprisonment are appropriate.

## CONCLUSION

We do not take lightly the tragic loss of two lives as a result of Phillips's actions.  The State proved beyond a reasonable doubt that Phillips is guilty of first-degree murder; thus, he must be held accountable.  However, while we affirm Phillips's convictions, because we conclude that the murders in this case are not among the most aggravated and least mitigated, the death penalty is a disproportionate punishment.  Therefore, we remand this case to the trial court with instructions that the court impose life sentences for each of Phillips's convictions for first-degree murder.

It is so ordered.

LABARGA, C.J., and PARIENTE, QUINCE, and PERRY, JJ., concur.
LEWIS, J., concurs in result.
CANADY, J., concurs in part and dissents in part with an opinion, in which
POLSTON, J., concurs.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND
IF FILED, DETERMINED.

CANADY, J., concurring in part and dissenting in part.

I concur in the affirmance of Phillips's two first-degree murder convictions.

I dissent, however, from the majority's conclusion that Phillips's death sentences

are a disproportionate penalty in this case. I would instead conclude that this

case—involving two murders by a defendant on probation—is among the most

aggravated and least mitigated of first-degree murder cases.

The majority primarily relies on Cooper v. State, 739 So. 2d 82 (Fla. 1999),

to support its conclusion that the death penalty is a disproportionate punishment in

this case. See majority op. at 18-20. But Cooper is distinguishable. The Court in

Cooper recognized that the case fell within the category of the "most aggravating"

murders, but concluded that the death sentence was disproportionate because the

case did not fall in the category of "the least mitigated of murders." See Cooper,

739 So. 2d at 85-86. Admittedly, there are some similarities between the

mitigation in Cooper and the mitigation presented by Phillips. But there are also

striking differences—differences establishing that Cooper involved significantly

greater mitigation. The defendant in Cooper established that he suffered from

- 21 -

"brain damage" and "mental illness (i.e., paranoid schizophrenia)." Id. at 86. Phillips did not establish similar mitigation. Cooper presented evidence of "brutal" mistreatment during his childhood, including being "frequently" threatened with a gun and "whipped and beat[en]" by his father. Id. at 84, 86. In contrast, Phillips simply established "childhood neglect." Majority op. at 16. I would conclude that the factors of brain damage, mental illness, and brutal mistreatment during childhood—which are absent in Phillips's case—were sufficient to place Cooper's case outside the category of "least mitigated." The mitigation in Phillips's case is similar to other cases in which we have found death sentences to be proportionate. See, e.g., Baker v. State, 71 So. 3d 802 (Fla. 2011); Wright v. State, 19 So. 3d 277 (Fla. 2009); Davis v. State, 2 So. 3d 952 (Fla. 2008).

I would also conclude that Phillips is not entitled to relief under Hurst v. Florida, 136 S. Ct. 616 (2016). The existence of the prior violent felony aggravator was established by the contemporaneous murder convictions. The existence of the commission of a robbery or burglary aggravator was established by the armed robbery conviction and the jury's unanimous finding that Phillips "committed each murder while engaged in the commission or attempted commission of a burglary and/or robbery." Majority op. at 7. The existence of the felony probation aggravator was conceded by Phillips who entered a stipulation "that Phillips was on felony probation at the time of the subject crimes." Majority

- 22 -

op. at 7. So the requirement of <u>Hurst v. Florida</u> that the jury find an aggravator was satisfied. See <u>Hurst v. State</u>, No. SC12-1947, 2016 WL 6036978 (Fla. Oct. 14, 2016) (Canady, J., dissenting).

POLSTON, J., concurs.

An Appeal from the Circuit Court in and for Duval County,
        Mark Hulsey, III, Judge - Case No. 162010CF000908AXXXMA

Martin J. McClain of McClain & McDermott, P.A., Wilton Manors, Florida,

        for Appellant

Pamela Jo Bondi, Attorney General, and Berdene Bevione Beckles, Assistant Attorney General, Tallahassee, Florida,

        for Appellee