# Supreme Court of Florida

_____

No. SC19-953
_____

**ROBERT CRAFT,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

November 19, 2020
**CORRECTED OPINION**

PER CURIAM.

Robert Craft appeals his conviction for first-degree murder and his sentence of death. We have jurisdiction. *See* art. V, § 3(b)(1), Fla. Const. For the reasons below, we affirm Craft's conviction and sentence of death.

## I. BACKGROUND

On May 16, 2018, Craft strangled and beat to death Darren W. Shira in the cell they shared at Columbia Correctional Institution. Following Shira's murder, Craft confessed multiple times, including in two recorded statements to Special Agent Terrance Tyler of the Florida Department of Law Enforcement and in letters to the state attorney's office and the trial court.

The trial court accurately summarized Craft's statements and the

circumstances of the killing in the sentencing order, in pertinent part, as follows:

> [T]he Defendant [admitted] that he "tortured" the victim "on purpose." He explained the various methods and manner in which he attacked the victim over approximately 30 minutes [and] . . . [h]e admitted that he only stopped this relentless attack when the victim's feet turned purple, there was blood coming out of the victim's nose, and the victim's eyes were bulging. . . .
>
> . . . .
>
> . . . The Defendant admitted that the victim did not pose a threat to him nor did the victim initiate the altercation. Rather, the Defendant admitted that the victim was lying on his bed when the Defendant initiated the attack by slapping the victim's feet. As soon as the victim sat up, the Defendant smacked or punched the victim's face and then launched into a physical attack that lasted, according to the Defendant, about a half hour.
>
> The Defendant explained that he first attempted to crush the victim's neck but that this proved more difficult than in the movies, so he had to strangle the victim. The victim offered minimal resistance. Nonetheless, the Defendant "beat on" the victim with his fists, continued to choke the victim, and pulled the victim off of his bed and onto the floor where the Defendant used his feet against the wall as leverage to push down on the victim's throat. The Defendant also tore off the white stripe that runs down the side of the prison pants and tied this around the victim's neck. . . .
>
> . . . .
>
> [Further,] . . . the Defendant admitted that he had planned the murder. Specifically, he explained that, after learning that the victim was in prison for allegedly molesting children, the Defendant determined that he was going to kill the victim and immediately began planning the murder, which he committed a few days later. According to his own admission, the Defendant waited because he first wanted to inform his sister, via letter, that he was going to "catch a body." He also

informed other inmates, prior to the killing, that he was going to kill the victim and was even offered a knife for the killing, which he refused. Another inmate, according to the Defendant, attempted to convince the Defendant not to do it. The Defendant also realized that the killing would likely be bloody, so he removed the victim's pants and donned them during the attack to prevent his pants from getting covered in blood. He further admitted that he had intended to sodomize the victim but that he could not do that. Moreover, while explaining to Special Agent Tyler that he had planned the murder for a few days, he stated that he wanted the murder to be "CCP" and even asked if it would be considered a hate crime because the victim was Jewish, gay, a child molester, and ex-Navy. The Defendant also told Special Agent Tyler that he had told the victim, while they were eating dinner [just before the killing], that this was the victim's last meal and that it was a pretty "f[***]ed up" last meal.[n.6]

> [N.6] Even the discovery of the body was orchestrated by the Defendant: he told the inmate trustee that he had some trash, and when directed to slide it under the door of his cell, he stated that a dead body would not fit.

(Footnote omitted.)

Craft was indicted for the victim's first-degree murder under the theory of premeditated murder on October 1, 2018. Shortly thereafter, he began expressing his desires to quickly end his case, plead guilty, waive a penalty-phase jury, waive mitigation, and receive the death penalty—both in letters to the state attorney's office and in a pro se "Motion for Faretta Hearing and Recusal of Counsel" filed in January 2019.

The trial court held a hearing on January 23, 2019, during which Craft maintained that he wanted to waive counsel and represent himself, that he wanted to proceed with a speedy bench trial, and that he did "not want mitigation." At the

hearing, the trial court asked Craft, "Do you know what the matters in mitigation are?" Craft responded, "Mitigation is to investigate, research and find if there's anything basically that would prevent me from getting the death penalty." The trial court further explained that mitigation can be "something that happened in [Craft's] childhood, whether it was something that happened during the case itself, whether it has to do with psychological, psychiatric problems. . . . It can have to do with . . . injuries, all kinds of things," and Craft indicated that he understood. The trial court deferred ruling on Craft's pro se motion pending evaluation of Craft by two mental health experts to determine his competency to proceed.

Both experts examined Craft on March 25, 2019, and thereafter submitted reports finding him competent. In finding Craft competent, Dr. Chris P. Robison noted that Craft "articulated a coherent rationale to support his determination to represent himself, plead guilty to the alleged offense and waive the opportunity to present mitigation testimony in his case, which would likely result in imposition of the death penalty in his case." Similarly, Dr. Salvatore M. Blandino noted that Craft "is competent to proceed and to go pro-se if he decides to proceed in this manner." (Emphasis omitted.)

On March 27, 2019, based on the experts' evaluations, the trial court orally found Craft competent, conducted a *Faretta*[1] inquiry, ruled that Craft could waive

1. *Faretta v. California*, 422 U.S. 806 (1975).

counsel and represent himself, and appointed standby counsel. Craft immediately

announced his desire to plead guilty. After taking a recess during which Craft and

the State discussed the written plea form, the trial court conducted an extensive

plea colloquy with Craft, using the colloquy outlined in this Court's decision in

*Lynch v. State*, 841 So. 2d 362, 376-77 (Fla. 2003), as a guide.

During the plea colloquy, the trial court explained the constitutional rights

that Craft would be waiving with a guilty plea, including the right to a trial by jury,

and further explained that if Craft pleaded guilty the case would move directly to

the penalty phase. Craft stated that he understood that by pleading guilty he was

waiving his right to have a jury determine whether he was guilty or not; that the

only two possible sentences for first-degree murder are life imprisonment or death;

that his case would proceed directly to the penalty phase as a result of his plea; and

that he was not threatened or coerced into pleading guilty or promised a specific

sentence in return for his plea. Craft further stated that he was pleading guilty to

the factual basis submitted by the State to support the plea, which was as follows:

> The indictment in this case and the evidence that supports it were that
> Mr. Craft on May the 16th, on or about that date, 2018, in Columbia
> County, specifically at the Columbia Correctional Institution,
> unlawfully and from a premeditated design and intent to effect the
> death of [the victim] did kill him by inflicting upon him mortal
> wounds and injuries, specifically Mr. Craft beat [the victim] and
> strangled him.
>
> As [Craft] just indicated during the plea colloquy . . . in terms
> of how long he had been thinking about it . . . , since May 15th, that

was while he was in a cell with [the victim] prior to the killing, further indicating a premeditated design and intent to effect the death of his cellmate.

. . . [O]n May the 16th, Columbia Correctional Institute personnel arrived at Mr. Craft's cell. Mr. Craft indicated to them that he had killed his cellmate. He then reiterated the same, indicating the manner in which he had done it, by beating and strangling him, in further interviews to the Florida Department of Law Enforcement and further detailed in letters and correspondence that he has sent to the office of the state attorney of his plan to effect the death of [the victim] and his actions in carrying out said acts. All again occurring within Columbia County, contrary to Florida Statute 782.04[(1)].

Thereafter, the trial court accepted Craft's plea, finding that it was "freely, voluntarily, knowingly and intelligently given."

During the March 27 plea colloquy, Craft had also stated that he wanted to waive his right to a penalty-phase jury. In response, the trial court provided a detailed explanation of how the penalty phase is conducted, including the presentation of aggravators and mitigators, and explained the procedure if a jury is not waived and the procedure if a jury is waived. The trial court paused its explanation several times to ask Craft if he understood, and each time Craft stated that he did, and he also indicated that he had "already gone over that with [his prior] attorney." After accepting Craft's plea, the trial court announced its intent to order a presentence investigation report (PSI).

After the PSI was completed, the penalty-phase proceeding was held on May 13, 2019. There, Craft maintained his desire to continue to waive counsel and

represent himself, and he also maintained his desire to waive his right to a penalty-phase jury, and indicated that he did not intend to present mitigation.

During the penalty-phase proceeding, the State presented the testimony of Agent Tyler, during which Craft's two unredacted recorded statements to Agent Tyler were played and photographs of the crime scene were admitted, all without objection by Craft. The State also presented the testimony of the medical examiner who autopsied the victim. During the medical examiner's testimony, photographs and x-rays of the victim's body were admitted, without objection by Craft. After describing the extensive injuries to the victim's head and neck, the medical examiner testified that the cause of death was strangulation and blunt force head trauma. He further opined that "a considerable amount of force would have to be applied for a length of time to produce these kinds of injuries." More specifically, he explained that when a person is being strangled, "it takes four or five minutes of constant pressure blocking the blood flow to the brain to start to cause lethal brain injury."

In addition to presenting these two witnesses, without objection from Craft, the State introduced a certified copy of Craft's 2015 judgment and sentence in support of the prior violent felony aggravator. Specifically, the State relied upon three of Craft's prior convictions, for which Craft was serving an aggregate fifteen-year sentence at the time of the victim's murder, namely aggravated battery with a

deadly weapon, aggravated assault with a deadly weapon, and armed false imprisonment. The State also introduced, without objection from Craft, a certified copy of Craft's records from the Department of Corrections, three letters that Craft had sent to the state attorney's office, and one letter that Craft had sent to the judge. The letters from Craft included admissions by Craft that he had killed the victim and threats to continue killing while in prison.

After the State rested its penalty-phase presentation, the trial court again inquired of Craft as to whether he wished to present mitigation. Craft answered, "Myself, no, I don't." Nevertheless, Craft presented the testimony of four family members "[f]or their conscience purpose," all of whom testified about Craft's background, including his traumatic childhood, and their love for him. Ultimately, Craft also made a statement "to clear everything up," in which, in addition to explaining why he pleaded guilty, admitting that he killed the victim, and explaining why he wanted a death sentence, Craft expressed love for his family and said that he was sorry that his actions had made them suffer.

Following Craft's presentation, the State asked to be heard on mitigation. "[N]ot anticipating [Craft's] family was going to show up," the prosecutor stated that he "did [his] best to come up with a range of non-statutory mitigators . . . based on the PSI, both mental health evaluations and other facts gleaned from within the entirety of the court file," and then presented those circumstances to the

trial court. Finally, the State presented argument as to why the trial court should find the prior-violent-felony, under-sentence-of-imprisonment, HAC, and CCP aggravators.

Thereafter, on June 7, 2019, the trial court held a joint *Spencer*[2] and sentencing hearing. During the *Spencer* portion of the hearing, Craft maintained his desire to represent himself, confirmed that he did not wish to be heard on any of the information contained in the PSI, and stated that he did not wish to offer anything else that had not been offered previously. Craft also confirmed that he had previously written two letters to the trial judge. The letters, which included admissions by Craft that he had killed the victim and threats to continue killing while in prison, were given to the clerk for filing. After concluding the *Spencer* hearing, the trial court recessed to finalize the sentencing order, and upon reconvening the hearing, sentenced Craft to death.

The sentencing order reflects that the trial court found the existence of four statutory aggravating factors beyond a reasonable doubt and assigned them the noted weight: (1) the capital felony was committed by a person previously convicted of a felony and under sentence of imprisonment or placed on community control or on felony probation (great weight); (2) the defendant was previously convicted of another capital felony or of a felony involving the use or threat of

_____

2. *Spencer v. State*, 615 So. 2d 688 (Fla. 1993).

violence to the person (great weight); (3) the capital felony was especially heinous, atrocious, or cruel (HAC) (very great weight); and (4) the capital felony was a homicide and was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (CCP) (very great weight).

The trial court considered but did not find any statutory mitigating circumstances. However, the trial court found the following four nonstatutory mitigating circumstances to which it assigned the noted weight: (1) childhood trauma (little weight); (2) close family ties (slight weight); (3) general mental health mitigation (some weight); and (4) good behavior during trial (little weight).

In sentencing Craft to death, the trial court found as follows:

> As explained above, this Court has found beyond a reasonable doubt the existence of four statutory aggravating factors, including both that the murder was committed in a cold, calculated, and premeditated manner and that it was especially heinous, atrocious, or cruel: "two of the most serious aggravators set out in the statutory sentencing scheme." *Larkins v. State*, 739 So. 2d 90, 95 (Fla. 1999). This Court assigned very great weight to those two "most serious aggravators," and great weight to the other two aggravating factors, which related to the Defendant's prior felonies.

> This Court carefully evaluated the statutory mitigating factors and found that none are applicable in this case. This Court found that four non-statutory mitigating factors have been sufficiently proven. These factors were afforded little, slight, some, and little weight, respectively.

> This Court, having compared the mitigating factors against the aggravating factors, finds that the aggravating factors clearly, convincingly, and beyond a reasonable doubt outweigh the mitigating factors. In fact, the mitigating evidence "is minimal and does not

- 10 -

come close to outweighing the aggravating factors." *McWatters v. State*, 36 So. 3d 613, 642 (Fla. 2010). In other words, although the number of mitigating factors is equal to the number of aggravating factors, the relevant inquiry and determination is not the sheer number but, rather, the weight afforded each factor. Here, the nature and quality of the mitigating evidence pales in comparison to the enormity of the aggravating factors proven in this case.

Craft now appeals, raising seven issues.

## II. ANALYSIS

Craft raises five mitigation-related challenges; argues that the trial court fundamentally erred by failing to determine beyond a reasonable doubt that the aggravating factors were sufficient to justify the death penalty; and contends that the trial court's failure to enter a written order finding him competent to proceed after orally announcing its competency finding requires remand for entry of a written nunc pro tunc order. Additionally, because Craft pleaded guilty to first-degree murder, our mandatory sufficiency review, *see* Fla. R. App. P. 9.142(a)(5), requires us to determine whether his guilty plea was knowingly, intelligently, and voluntarily entered.[3]

---

3. The State also raised the issue of the comparative proportionality of Craft's death sentence. However, after oral argument in this case, in *Lawrence v. State*, 45 Fla. L. Weekly S277, S279 (Fla. Oct. 29, 2020), we receded from the judge-made requirement to review the comparative proportionality of death sentences as contrary to the conformity clause of the Florida Constitution. Accordingly, we do not review the comparative proportionality of Craft's sentence of death.

- 11 -

## A. Mitigation

Craft first challenges the trial court's handling of mitigation in five respects. Specifically, he argues that (1) the trial court erred in accepting his waiver of the right to present mitigation; (2) the trial court abused its discretion in assigning little weight to the mitigating circumstance of childhood trauma, the same weight assigned to the mitigating circumstance of good behavior during trial; (3) the trial court abused its discretion in imposing the death penalty without requiring the State to present all mitigating evidence in its possession and without calling mitigating witnesses or appointing special counsel; (4) the trial court abused its discretion by failing to consider all believable and uncontroverted mitigation in the record; and (5) cumulatively, the trial court's errors respecting mitigation entitle Craft to relief from his sentence of death. As explained below, none of these claims warrants relief.

### 1. Mitigation Presentation

In his first mitigation-related challenge, Craft argues that the trial court erred in accepting his waiver of the right to present mitigation. "The standard by which [this Court] review[s] a trial court's acceptance of a death penalty defendant's waiver of the right to present mitigating evidence is whether the court abused its discretion." *Robertson v. State*, 187 So. 3d 1207, 1212 (Fla. 2016). However, Craft's case does not involve a waiver of the *right* to present mitigation because

Craft presented the testimony of four family members and also made his own statement during the penalty-phase proceeding. *Cf. Boyd v. State*, 910 So. 2d 167, 188 (Fla. 2005) ("Boyd did not ultimately waive his *right* to present mitigation. After discussing matters with his friends and family, Boyd elected to testify during the penalty phase and allowed his pastor to testify."). Although the mitigation presented through Craft was limited, and although Craft stated that he was calling his family members to testify "[f]or their conscience purposes" and further said that the purpose of his own penalty-phase statement was "to clear everything up," the trial court would have abused its discretion had it not considered the believable and uncontroverted mitigation presented through these witnesses. *See Robinson v. State*, 684 So. 2d 175, 177 (Fla. 1996) ("It is well settled that mitigating evidence must be considered and weighed when contained anywhere in the record, to the extent it is believable and uncontroverted."). We refuse to find a waiver of the *right* to present mitigation in a case where the defendant actually presented mitigation. *Cf. Boyd*, 910 So. 2d at 188.

Nor did the trial court err in accepting Craft's limited mitigation presentation. We have consistently held that, "in the final analysis, all competent defendants have a right to control their own destinies," including with respect to the presentation of mitigation. *Hamblen v. State*, 527 So. 2d 800, 804 (Fla. 1988). Moreover, the record reflects several instances in which the trial court discussed

- 13 -

mitigation and its importance with Craft, and based on Craft's representations that he would not present mitigation, before conducting the penalty phase, the trial court ordered a PSI. *See* Fla. R. Crim. P. 3.710(b) ("Should a defendant in a capital case choose not to challenge the death penalty and refuse to present mitigation evidence, the court shall refer the case to the Department of Corrections for the preparation of a presentence report. The report shall be comprehensive and should include information such as previous mental health problems (including hospitalizations), school records, and relevant family background."). It is clear from the record that, in addition to considering the unexpected testimony presented by Craft and his family members during the penalty phase, the trial court endeavored to consider available mitigation present elsewhere in the record, including in the PSI and competency evaluations. We find no abuse of discretion.

*2. Childhood-Trauma Mitigator*

Craft next argues that the trial court abused its discretion in assigning little weight to the mitigating circumstance of childhood trauma, the same weight assigned to the mitigating circumstance that Craft exhibited good behavior during trial. We "review[] a trial court's assignment of weight to mitigation under an abuse of discretion standard," *Bevel v. State*, 983 So. 2d 505, 521 (Fla. 2008), and "will not disturb the sentencing judge's determination as to 'the relative weight to give to each established mitigator' where that ruling 'is supported by competent

substantial evidence,' " *Gill v. State*, 14 So. 3d 946, 964 (Fla. 2009) (quoting *Blackwood v. State*, 777 So. 2d 399, 412-13 (Fla. 2000)).

Here, the trial court found that testimony from Craft's penalty-phase witnesses and the PSI established that he experienced a traumatic childhood. However, the trial court assigned this mitigating circumstance little weight based on its findings that "there was no showing that these experiences diminished [Craft's] ability to know or understand right from wrong" and that "the evidence presented was not sufficient to establish that [Craft's] childhood and adolescence had an ill effect on [Craft]." Although Craft argues that the weight assigned to the childhood-trauma mitigator was arbitrary and unreasonable because the trial court also assigned the same weight to the mitigating circumstance that Craft exhibited good behavior during trial, the sentencing order reflects that the trial court independently considered and weighed both mitigating circumstances, and the trial court's findings with respect to both circumstances are supported by competent, substantial evidence. Moreover, as the State points out, the trial court did not simply arbitrarily assign all mitigation the same weight. Rather, based in large part on the competency evaluations by the mental health experts, the trial court more heavily weighted the mitigating circumstance of "general mental health mitigation," assigning it "some weight." Because we cannot say on the facts of this case that no reasonable trial court would have failed to assign the childhood-

- 15 -

trauma mitigating circumstance more than little weight, we hold that the trial court did not abuse its discretion.

*3. Failure to Inquire of the State, Call Witnesses, or Appoint Special Counsel*

Third, Craft argues that the trial court abused its discretion in imposing the death penalty without requiring the State to present all mitigating evidence in its possession and without calling mitigating witnesses or appointing special counsel. We disagree.

Regarding Craft's argument pertaining to the State, this Court has explained that "[t]he trial court should . . . require the State 'to place in the record all evidence in its possession of a mitigating nature such as school records, military records, and medical records.' " *Marquardt v. State*, 156 So. 3d 464, 491 (Fla. 2015) (quoting *Muhammad v. State*, 782 So. 2d 343, 363-64 (Fla. 2001)). However, Craft does not identify any mitigation allegedly in the State's possession but not in the record. *Cf. Muhammad*, 782 So. 2d at 364 n.11 (explaining that requiring the State to place such items in the record "is consistent with the prosecutors' existing obligations" under the Florida Rules of Professional Conduct). Moreover, the record shows that the prosecutor stated during the penalty-phase proceeding that because he had not anticipated that Craft's family members would testify, he "did [his] best to come up with a range of non-statutory mitigators" based "on the PSI, all the family statements attached to the PSI, both

mental health evaluations and other facts gleaned from the entirety of the court file." The State plainly attempted to aid the trial court in its consideration of mitigation. We hold that the trial court did not abuse its discretion by failing to inquire of the State about additional mitigation.

We also reject Craft's argument that the trial court abused its discretion by failing to call mitigating witnesses or appoint special counsel. *See Robertson*, 187 So. 3d at 1214 ("Whether to appoint special counsel was a matter within the court's discretion."); *see also Muhammad*, 782 So. 2d at 364 (recognizing that "the trial court has the discretion to call persons with mitigating evidence as its own witnesses"). As we have already explained, as a competent defendant, Craft had the right to control the mitigation presented in his case. *See Hamblen*, 527 So. 2d at 804. Moreover, Craft does not identify the additional witnesses he now claims that the trial court should have known to call based on the information in the record. Further, the trial court ordered a PSI and two competency evaluations, and Craft's prior criminal history is in the record. Consequently, the record contains a substantial amount of information about the circumstances of Craft's offense and Craft's character and background in addition to the mitigation presented by Craft during the penalty-phase proceeding. *Cf. Robertson*, 187 So. 3d at 1214 ("[T]he [trial] court had before it all the documents and background information from which mitigating evidence could have been derived had Robertson allowed such

evidence to be presented, particularly as Robertson has spent most of his adult life in prison and was incarcerated as a juvenile before that."). On these facts, the trial court did not abuse its discretion.

### 4. Failure to Consider Mitigation

Fourth, Craft argues that the trial court abused its discretion by failing to consider all believable and uncontroverted mitigation in the record. Specifically, Craft points to nine items of alleged mitigation that he contends the trial court failed to consider, namely (1) Craft was born with the umbilical cord around his neck and was blue and not breathing; (2) Craft's mother failed to obtain proper mental health treatment for Craft and felt that she could "beat it out of him"; (3) by age four, all of Craft's baby teeth were rotten because of malnutrition, and at times, Craft's mother would starve the children; (4) Craft was designated "emotionally handicapped" and a "slow learner," classified as "mentally retarded,"[4] and was enrolled in special education classes; (5) Craft began drinking beer and smoking marijuana around age ten or twelve, and later began using crystal

---

4. Craft's aunt, Barbara Chapple, was interviewed for the PSI, and she stated that Craft "was classified as 'mentally retarded' before the age of 12." Craft's other aunt, Michelle Griggs, was also interviewed, and she "stated that the 'mental retardation' designation as a child was due to his learning disabilities." One of Craft's competency evaluation reports includes the mental health expert's finding that Craft "appears to function at or near the average range of general intelligence." No argument has been advanced that Craft is intellectually disabled.

methamphetamine; (6) Craft had previously worked, including repairing vehicles, welding, tree service, carpentry, and painting/remodeling; (7) as an adult, Craft saved a fellow inmate's life while they were both in jail[5]; (8) Craft immediately, and repeatedly, confessed to killing the victim; and (9) Craft later pleaded guilty to first-degree murder.

The trial court's sentencing order reflects that Florida law requires the sentencing court to " 'consider *all* mitigating evidence' [found] anywhere in the record." *Gill*, 14 So. 3d at 955 (quoting *Muhammad*, 782 So. 2d at 363); *see also Robinson*, 684 So. 2d at 177 (explaining that this requirement applies to available mitigation that is "believable and uncontroverted"). The sentencing order further explains that the trial court "considered the testimony and observed the demeanor of all witnesses, reviewed all exhibits introduced into evidence, weighed the argument by counsel and the Defendant, reviewed Defendant's two mental health evaluations, and reviewed the [PSI]." Then, as authorized by *Ault v. State*, 53 So. 3d 175, 194 (Fla. 2010), the trial court "group[ed] into categories proposed mitigating factors that are related in content," conducted a detailed analysis, and assigned weight to each of the four categories it found, which were childhood

---

5. The PSI indicates that, while in jail, Craft saved the life of a fellow inmate who allegedly intended to commit suicide.

trauma, close family ties, general mental health mitigation, and good behavior during trial.

At oral argument, the State conceded that the trial court failed to consider items 6 and 7, Craft's prior employment history and that Craft had saved a fellow inmate's life. Our review of the sentencing order confirms that neither of these mitigating circumstances can be fairly assigned to any of the four categories of mitigation found by the trial court. However, we reject Craft's argument that the trial court erred with respect to the remaining seven items. Items 1-5 all relate to the mitigating circumstances of "childhood trauma" or "general mental health." Moreover, the sentencing order expressly mentions Craft's confession and guilty plea (items 8 and 9), indicating that rather than overlook these items as potential mitigation, the trial court did not consider them mitigating based on the facts of this case. *Cf. Agan v. State*, 445 So. 2d 326, 328-29 (Fla. 1983) (rejecting, in a case where the defendant "declined to present any evidence in mitigation," the claim that the trial court erred by failing to find the defendant's "willingness to cooperate by confessing . . . and pleading guilty" as a mitigating circumstance where it was "apparent that the trial judge did consider and reject this willingness to cooperate as a mitigating circumstance" based on the finding in the sentencing order that the defendant "shows no remorse but seeks rather a chance to kill again" if he receives a life sentence).

### 5. Cumulative Error

Because we agree with Craft that the trial court erred in failing to consider the believable and uncontroverted mitigation of Craft's prior employment history and that Craft had saved a fellow inmate's life, *see Robinson*, 684 So. 2d at 177, we address Craft's last mitigation-related argument, namely that the cumulative effect of the trial court's errors entitle him to relief from his sentence of death. In light of the substantial aggravation in this case—including the HAC, CCP, and prior-violent-felony aggravators, which are three of the most serious and weighty aggravators in the capital sentencing scheme, *see Bush v. State*, 295 So. 3d 179, 215 (Fla. 2020)—we hold that there is no reasonable possibility that the trial court's failure to consider the additional mitigation of Craft's prior employment or his having saved a fellow inmate's life contributed to the sentence. *See Ault*, 53 So. 3d at 195 (setting forth the harmless-error standard that applies where the trial court errs in rejecting *proposed* mitigation, namely "whether there is a reasonable possibility that the error contributed to the sentence") (citing *State v. DiGuilio*, 491 So. 2d 1129, 1138 (Fla. 1986)); *Rogers v. State*, 285 So. 3d 872, 890 (Fla. 2019) (concluding that the trial court's error in failing to find a *proposed* mitigating circumstance that was supported by the record "was harmless beyond a reasonable doubt because there is no reasonable possibility that the trial court would have imposed a life sentence" but for the error in light of the weighty aggravating

circumstances).[6]  Accordingly, Craft is not entitled to relief as a result of the trial court's failure to consider these two mitigating circumstances.

## B. Sufficiency of Aggravators

Next, Craft argues that the trial court fundamentally erred by failing to determine beyond a reasonable doubt that the aggravating factors were sufficient to justify the death penalty.  However, in cases where the defendant did not waive the right to a penalty-phase jury, we have repeatedly held that this determination is

---

6. We note that *Rogers* and other similar cases applying the harmless-error standard of review to trial court errors respecting mitigation, *see, e.g.*, *Ault*, 53 So. 3d at 187, address mitigation *proposed* by the defendant.  In contrast, here, the two items of mitigation that the trial court failed to consider were not part of the limited mitigation that Craft presented during the penalty phase proceeding.  Rather, they were contained in the PSI, and Craft expressly stated at the *Spencer* hearing that he did not wish to be heard on any of the information contained in the PSI.  However, the State has not asked us to apply a fundamental-error standard of review to Craft's argument that the trial court erred in failing to consider mitigation that he did not propose below.  *Cf. Fennie v. State*, 855 So. 2d 597, 608-09 (Fla. 2003) (holding trial court's failure to assign weights to the individual aggravating and mitigating circumstances did "not constitute *fundamental error* because the sentencing order was otherwise thorough and detailed, addressed all of the matters claimed in mitigation and aggravation, and contained a proper weighing analysis even though individual weights were not assigned," allowing this Court "to conduct a meaningful review of [the defendant's] case on direct appeal") (emphasis added); *see generally Hayward v. State*, 24 So. 3d 17, 42 (Fla. 2009) (explaining that unpreserved errors are reviewed for fundamental error).  We are not aware of a decision expressly addressing the proper standard of review on facts similar to those at issue in this case.  Nevertheless, our holding that the errors respecting mitigation in Craft's case are harmless makes it unnecessary to resolve this issue because error that is harmless cannot be fundamental.  *See Reed v. State*, 837 So. 2d 366, 370 (Fla. 2002) ("If the error was not harmful, it would not meet our requirement for being fundamental.").

"not subject to the beyond a reasonable doubt standard of proof." *Newberry v. State*, 288 So. 3d 1040, 1047 (Fla. 2019) (citing *Rogers*, 285 So. 3d at 886); *see also McKinney v. Arizona*, 140 S. Ct. 702, 707-08 (2020) (explaining that "[u]nder *Ring* [*v. Arizona*, 536 U.S. 584 (2002),] and *Hurst* [*v. Florida*, 577 U.S. 92 (2016)], a jury must find the aggravating circumstance that makes the defendant death eligible" but that "*Ring* and *Hurst* did not require jury weighing of aggravating and mitigating circumstances"); *State v. Poole*, 297 So. 3d 487, 505, 507 (Fla. 2020) (concluding that "only one of the findings . . . identified in *Hurst v. State* [202 So. 3d 40 (Fla. 2016)]—the finding of the existence of an aggravating circumstance—qualifies as an element, including for purposes of our state constitution" and "reced[ing] from *Hurst v. State* except to the extent it requires a jury unanimously to find the existence of a statutory aggravating circumstance beyond a reasonable doubt"). Recently, in *Lawrence v. State*, 45 Fla. L. Weekly S277, S282 n.8 (Fla. Oct. 29, 2020), we confirmed that the same claim is equally meritless where, as here, the defendant waived the right to a penalty-phase jury. *See also* § 921.141(3)(b), Fla. Stat. (2019) (subjecting only the trial court's finding of the existence of at least one aggravating factor to the beyond a reasonable doubt standard of proof). Accordingly, because the trial court did not err, let alone fundamentally so, Craft is not entitled to relief.

## C. Competency

In the final issue raised by Craft, he argues that his case must be remanded to the trial court for the entry of a written order nunc pro tunc to the date the trial court orally found him competent to proceed. In *Santiago-Gonzalez v. State*, 301 So. 3d 157, 175 (Fla. 2020), we recognized that "this Court has read Florida Rule of Criminal Procedure 3.212(b) as requiring issuance of a written order of competency." There, however, we addressed as an issue of first impression whether, in cases where the failure to enter a written order was not brought to the trial judge's attention, the failure should be remediable on appeal only if it constitutes fundamental error. *See id.* at 175 & n.5. We held that it should. *Id.* at 175.

As in *Santiago-Gonzalez*, the trial court's failure to enter a written order in Craft's case does not constitute fundamental error. After the trial court orally found Craft competent on March 27, 2019, nothing in the record indicates that the failure to enter a written order was brought to the trial court's attention. In light of the trial court's oral competency finding in Craft's case, which is fully supported by the record, including determinations by two experts that Craft was competent to proceed, Craft has not demonstrated fundamental error. Accordingly, he is not entitled to relief on this issue. *See id.*

**D. Guilty Plea**

Although Craft has not raised the issue, "[b]ecause the conviction for which the death penalty was imposed in this case was the result of [the defendant's] guilty plea, our mandatory [sufficiency] review 'shifts to the knowing, intelligent, and voluntary nature of that plea.' " *Gill*, 14 So. 3d at 950 n.4 (quoting *Tanzi v. State*, 964 So. 2d 106, 121 (Fla. 2007)); Fla. R. App. P. 9.142(a)(5) ("On direct appeal in death penalty cases, whether or not insufficiency of the evidence . . . is an issue presented for review, the court shall review the[] issue[] and, if necessary, remand for the appropriate relief."); *see also Doty v. State*, 170 So. 3d 731, 738-39 (Fla. 2015) (explaining that "th[is] Court must 'scrutinize the plea to ensure that the defendant was made aware of the consequences of his plea, was apprised of the constitutional rights he was waiving, and pled guilty voluntarily' " and further addressing whether "[t]he factual basis for the plea provide[d] competent, substantial evidence to support the conviction for first-degree murder") (quoting *Winkles v. State*, 894 So. 2d 842, 847 (Fla. 2005)).

In Craft's case, the trial court conducted an extensive inquiry into Craft's knowledge and understanding of the charge against him, the constitutional rights he was waiving as a result of his guilty plea, and the consequences of pleading guilty. During the colloquy, Craft stated that he understood that the only two possible sentences for first-degree murder are life imprisonment or death, that his

case would proceed directly to the penalty phase as a result of his plea, and that he was not threatened or coerced into pleading guilty or promised a specific sentence in return for his plea. Our review of the record confirms that Craft's guilty plea to first-degree murder was knowing, intelligent, and voluntary, and the factual basis for Craft's plea provides competent, substantial evidence to support his conviction for first-degree murder. *Cf. Doty*, 170 So. 3d at 739.

### III. CONCLUSION

For the foregoing reasons, we affirm Craft's conviction for first-degree murder and his sentence of death.

It is so ordered.

CANADY, C.J., and POLSTON, LAWSON, MUÑIZ, COURIEL, and
GROSSHANS, JJ., concur.
LABARGA, J., concurs in result with an opinion.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND,
IF FILED, DETERMINED.

LABARGA, J., concurring in result.

In light of this Court's decision in *Lawrence v. State*, 45 Fla. L. Weekly S277 (Fla. Oct. 29, 2020) (receding from proportionality review requirement in death penalty direct appeal cases), and for the reasons expressed in my dissent in *Lawrence, id.* at S279-82, I can only concur in the result.

An Appeal from the Circuit Court in and for Columbia County,
    Paul S. Bryan, Judge - Case No 122018CF000667CFAXMX

Andy Thomas, Public Defender, and Richard M. Bracey, III, Assistant Public Defender, Second Judicial Circuit, Tallahassee, Florida,

    for Appellant

Ashley Moody, Attorney General, and William David Chappell, Assistant Attorney General, Tallahassee, Florida,

    for Appellee